**EAST BAY MUNICIPAL UTILITY DISTRICT, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF COMMERCE, et al., Defendants.**

Civil Action No. 93–1715 (GK).

United States District Court,
District of Columbia.

Dec. 4, 1996.

Andrew L. Lipps, Edward Berlin, Leonard A. Miller, Robert V. Zener, Swidler & Berlin, Chartered, Washington, DC, for Plaintiff.

Martin F. McDermott, Cameron C. Powell, Environmental Defense Section, United States Department of Justice, Washington, DC, for Defendant.

### MEMORANDUM OPINION

KESSLER, District Judge.

This matter is before the Court on the parties' Renewed Cross–Motions for Summary Judgment. Plaintiff brings this action under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, by the East Bay Municipal Utility District (EB-MUD). EBMUD seeks recovery for certain remediation costs it has incurred and may incur in the future to clean up hazardous waste at the Penn Mine. Plaintiff alleges that the U.S. government is liable for these costs because of the involvement of various government agencies with the zinc mining activities at Penn Mine during, and directly after, World War II. By Order of September 14, 1993 (Richey, J.), this case was bifurcated. Accordingly, the issues presented for review in this portion of the bifurcated proceedings relate solely to liability. The parties filed Cross–Motions for Summary Judgment on this issue in April 1994. Judge Richey held a hearing on the Motions in May 1994, but, on May 27, 1994, denied them without prejudice to renewal at trial. The case was reassigned to this Court on July 1, 1994. At a status hearing on September 2, 1994, the Court allowed the parties to renew their motions. At a further status hearing on May 3, 1996, both parties reiterated their positions that the case could be disposed of on the basis of summary judgment and urged the Court to give serious consideration to the pending motions despite the daunting record and the many factual (although not necessarily material) issues in dispute. Upon review of the Cross–Motions, the Oppositions thereto, the Replies, the numerous supplemental memoranda submitted by both parties, and the entire record herein, the Defendants' Renewed Motion for Summary Judgment is hereby granted and Plaintiff's Renewed Motion for Partial Summary Judgment is hereby denied.

### I. The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)

The Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.*, was signed into law in 1980. It was enacted to address the increasing environmental and health problems associated with inactive hazardous waste sites. CERCLA encourages private cleanup of such hazards by providing a cause of action for the recovery of costs incurred for responding to a "release" of hazardous substances at any "facility." *Id.* § 9607. Under CERCLA, a person who incurs cleanup costs is entitled to recover from anyone who qualifies as a "responsible person" under the statute. *Id.* The federal

government is deemed a "person" under CERCLA. *Id.* § 9601(21).

Responsible persons under CERCLA include: (1) the current "owner" or "operator" of the facility; (2) any person who "owned" or "operated" the facility at the time of "disposal of any hazardous substance"; (3) any person who "arranged for disposal or treatment" of hazardous substances at the facility; and (4) any person who accepts hazardous substances "for transport to disposal or treatment facilities, incineration vessels or sites." *Id.* § 9607(a). Any of these responsible persons is strictly liable for costs incurred in responding to the release of a hazardous substance at the facility, subject only to the defenses set forth in the statute. 42 U.S.C. § 9607; *Kelley v. EPA,* 15 F.3d 1100, 1103 (D.C.Cir.1994), *reh'g denied,* 25 F.3d 1088 (D.C.Cir.1994), *cert. denied sub nom., American Bankers Ass'n v. Kelley,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995). Once responsible parties are identified, the court has the authority to "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.* § 9613(f)(1).

## II. *Background*

The record submitted in this case is voluminous and includes documents dating from the 1800's. However, the parties were able to sufficiently narrow the relevant issues so that they could submit a joint statement of undisputed facts in conjunction with their Cross–Motions for Summary Judgment.[1] Every fact cited herein, unless otherwise noted, comes from that statement. Although there are a number of significant of facts in dispute,[2] the Court specifically finds that none of these factual disputes are material to

the issues presented in the parties' Cross–Motions for Summary Judgment, and, therefore, they need not be resolved in order to decide the Cross–Motions.

Plaintiff EBMUD is a municipal utility district located in Northern California. R.S. ¶ 1. The Penn Mine is a currently inactive zinc and copper mine located upstream of the Mokelumne River in Calaveras County, California, adjacent to the Comanche Reservoir. R.S. ¶ 3. Copper was discovered in the mine in approximately 1861. Mining began shortly thereafter and continued until 1867. A smelter built at the Penn Mine site in 1863 was dismantled after mining stopped in 1867. Penn Mine's next period of operation lasted from approximately 1899 through 1919. During that time, another smelter was built on the site that operated continuously during those twenty years. The ore mined was primarily copper. Although some zinc ores were removed, they were not recovered and used at that time. Approximately 87% of all the ore ever produced from Penn Mine was produced by 1919. When the mine was shut down in 1919, the on-site smelter was also shut down and dismantled. The mine was kept pumped out until 1926, when the pumps were removed and the mine was allowed to fill with water. Between 1919 and World War II, there were several intermittent but largely unsuccessful attempts at reestablishing mining operations, which produced approximately 2,200 tons of ore. R.S. ¶¶ 20–27. There were additional periods of operation during World War II, R.S. ¶ 27, and after the Korean War. R.S. ¶ 98. All mining ceased in or about 1953, and the mine was closed down. Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue, ¶ 7.[3]

---

1. That statement is the Revised Joint Statement of the Parties, filed May 24, 1994, hereinafter referred to as "R.S.".

2. The facts disputed by the parties, but not material to the resolution of the narrow issue presented, include, *inter alia:*
   1. Whether Plaintiff owns any of the land on which the facility is located. R.S. ¶ 3.
   2. The degree to which the United States controlled all aspects of the national production and distribution of zinc. R.S. ¶¶ 34, 37.
   3. Whether the government knew that preparing Penn Mine to produce zinc would

lead to pollution of the Mokelumne River. R.S. ¶¶ 103–104.
   4. Whether a critical zinc shortage existed in the United States in 1944. R.S. ¶ 39.
   5. The degree to which the War Manpower Commission's labor freeze was effective. R.S. ¶¶ 35, 53.

3. Defendants' position with respect to Paragraphs Five through 18 of Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue is that they neither agree nor disagree with this statement, but believe that it is more proper-

Operations at Penn Mine left debris containing hazardous substances spread over 20 acres of significantly disturbed land at the site. R.S. ¶3. Some of this material was deposited as a result of mining conducted during World War II. These materials contain hazardous substances, including copper, zinc, cadmium and lead. When the waste rock, mine tailings, and excavated ores are exposed to oxygen and water, they oxidize and form acid. This acid leaches heavy metals in the area of the reaction. Rainwater or other water flowing over the oxidized materials readily dissolves and carries the acid and metals. This is commonly known as acid rock drainage or acid mine drainage. Two intermittent streams flow through the Penn Mine site carrying acid mine drainage. During periods of mining activity and for several years thereafter, these creeks flowed directly into the Mokelumne river. Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue, ¶¶ 5-10.[4]

For environmental and fiscal reasons not relevant here, EBMUD needed to construct a storage and stream flow reservoir, to be known as the Comanche Reservoir, on the Mokelumne River downstream from Penn Mine. Authorization for development was conditioned on EBMUD's acquisition of a small portion of the inactive mine site through condemnation. Although the owner of Penn Mine was directed to take corrective actions to mitigate the effects of acid mine drainage, it did not do so. A regional environmental board then formally requested EBMUD to abate the problem by building an impoundment on the portion of land it owns at the Penn Mine site. EBMUD built the impoundment, known as the Mine Run Dam. Plaintiff's Statement of Material Facts as to Which There Is No Genuine Issue, ¶¶ 14-19.[5] For over sixteen years, EBMUD has conducted investigations and studies concerning the environmental problems of the Mokelumne River, the Comanche Reservoir, the Mine Run Dam, and the Penn Mine site. In 1993, pursuant to Section 309 of the Clean Water Act, the Environmental protection

Agency ("EPA") issued several orders requiring EBMUD to take steps to mitigate the adverse environmental effects from any hazardous releases, including the construction and operation of a system to treat and discharge waters in the Mine Run Dam Reservoir. In December 1993, the EPA issued an order requiring EBMUD to perform detailed studies regarding proposed remedies and to submit plans to the EPA for remediation of the Penn Mine site. R.S. ¶ 19. EBMUD sued to recover costs related to the cleanup from the United States government.

The Defendants are the United States Department of Commerce ("Commerce"), the Secretary of Commerce in his official capacity, and the United States of America. The Department of Commerce is the successor in interest to three wartime organizations: the War Production Board ("WPB"), an agency of the United States created to assist in the war production and procurement efforts during World War II; the Reconstruction Finance Corporation ("RFC"), a government organization that made loans to assist in the war effort; and the Metals Reserve Company ("MRC"), a subsidiary of the Reconstruction Finance Company, whose mission was to purchase strategic metals for the United States. R.S. ¶¶ 28, 36.

At issue here is the government's involvement in the activities and operations of Penn Mine. Plaintiff claims that this involvement stems from the combined activities of the WPB, the War Manpower Commission ("WMC") (responsible for dealing with labor supply problems arising in critical industries), the Office of Price Administration ("OPA") (a government agency that, in conjunction with the WPB, established and administered price controls), and the MRC. Plaintiff alleges that these agencies issued numerous regulations and orders related to Penn Mine's production of zinc, a non-ferrous metal used to make armaments for the World War II effort. These regulations and orders allegedly controlled the type and quantity of ore to be mined, production schedules, prices, and marketing and labor

ly addressed in Phase II of the bifurcated proceedings.

**4.** *See supra* note 3.

**5.** *See supra* note 3.

issues. Plaintiff alleges that, beginning in 1942, the United States exercised sufficient control over Penn Mine to incur liability as an "operator" of the mine or an "arranger" of waste disposal at the mine. Defendants contend that the activities at issue cannot expose them to liability.

## A. War and Post–War Regulation

In response to the necessities of war, the WPB was given special authority and powers. Its broad mission was to direct the government's procurement and production efforts. The WPB was given the power to take all lawful steps to assure an adequate supply of materials essential to production for the defense effort. Prior to 1943, the WPB's powers included the ability to direct the Army or Navy to seize production facilities of plants that could supply necessary defense goods but either refused to do so or refused to do so at reasonable prices. After 1943, seizure was authorized only for those facilities unable to produce because of labor stoppages. R.S. ¶ 28–33.

As part of the wartime regulatory scheme, the WPB ascertained zinc supply requirements. It also located zinc mines, investigated them, and then recommended them for federal funding available through the RFC or MRC. All funding recommendations had to be approved by the WPB and the Secretary of Commerce. As of November 1943, The RFC and MRC had approved fourteen mining projects to receive federal funds, including Penn Mine.[6] R.S. ¶¶ 34, 40.

By the summer of 1942, the WPB recognized that the labor shortage in the western mining regions was acute. In September 1942, the WMC issued an Employment Stabilization Order declaring all 12 western states critical labor areas. At the same time, all non-ferrous metal mining and related activities, as well as lumbering and logging, were deemed essential war production activities. No worker engaged in these activities was allowed to seek other employment without obtaining a "Certificate of Separation" from a representative of the United States Employ-

ment Service. An employer within the critical areas was prohibited from employing any worker who had been engaged in mining operations who did not have a Certificate of Separation. In August 1942, the WMC issued new regulations that allowed employees engaged in essential war production to change employment under certain conditions. Those employees were given a "Statement of Availability" to prove that they were authorized to change jobs. The U.S. Employment Service had the authority to sanction noncomplying establishments by issuing "Statements of Availability" to all of their employees. Those employees could then leave the offending employer and seek new employment. However, the Order was deemed to be "completely ineffective," according to one government study which reviewed its history. R.S. ¶¶ 51–53.

On October 8, 1942, the WPB issued an Order closing nonessential gold mines. After this Order, at least 1,600 men who had worked in gold mines were referred for employment in non-ferrous mines, although they were not obligated to take such employment. In 1942, local draft boards began granting occupational deferments for essential workers. In July 1943, the Director of the Selective Service System strongly encouraged local boards to grant deferments for workers in the non-ferrous mining industry in critical labor areas. If a worker left employment in an essential industry, his deferment would be revoked. R.S. ¶¶ 55–58. The WMC also began requiring a minimum work week of 48 hours for all employees in western mines. R.S. ¶ 60.

Labor regulation did not end there. Several priority systems relating to the labor supply were implemented, three of which are relevant here. First, beginning in June 1943, the WPB classified mines into four categories, depending on their importance to the war effort, their relative productivity, and their priority for recruiting new workers. Class I was the highest priority. Second, in 1945, the WPB established a system of "production urgency orders" for determining

---

**6.** Federal funding of new zinc mining projects was discontinued after November 1943. R.S. ¶ 40.

manpower priority ratings. Facilities were rated I through VII depending on the relative need for their product and the extent to which production was lagging. Urgency Rating I, for example, was reserved for projects such as the atomic bomb. R.S. ¶¶ 61–64.

Third, in 1944, the WMC established a nationwide, uniform system for priority employment referrals. Seven categories were established. Regional, state, and area directors were authorized to assign ratings to work orders in categories two through seven, but only the Chairman of the National Manpower Priorities Committee could assign a Category 1 rating. The U.S. Employment Service was required strictly to adhere to these priority ratings when making worker referrals. Thus, a facility whose work orders carried a priority rating of Category 1 received referrals for needed workers before facilities in any other category. R.S. ¶¶ 65–66.

To further direct production for the war effort, the Office of Production Management, the predecessor of the WPB, and, later, the WPB, worked with state governments to determine which mines in each state were active, producing mines. Those mines were issued serial numbers that enabled them to obtain priority assistance for supplies and equipment. The Mining Division of the WPB established field offices to implement these priority allocations. In addition, the government issued allocation orders that controlled the distribution of many materials. The parties dispute when these allocation orders were in effect with respect to the zinc industry, but do agree that, at some time during World War II, zinc allocation orders were issued under the direction of the WPB. A zinc producer could deliver zinc only on the presentation of an allocation certificate issued by the WPB, specifying the grades and amount that could be shipped. No person could accept delivery of zinc except as authorized by government regulation. A willful violation subjected the offender to a fine or imprisonment. R.S. ¶¶ 38–39.

Price controls and subsidies were also implemented. Following the outbreak of the war in Europe, metal prices were unstable.

The price of zinc rose from 5–½ cents per pound in January 1940 to 7–¼ cents per pound in September 1940. In September 1940, the predecessor to the OPA reached an agreement with the principal zinc producers informally freezing the price of zinc at 7–¼ cents per pound. In October 1941, OPA raised the ceiling price to 8–¼ cents per pound. R.S. ¶¶ 42–43.

Production levels were still below those required to sustain the war effort. In January 1942, OPA and the WPB put into effect a Premium Price Plan. Under the Plan, each mine producing zinc prior to the war was assigned a "quota" reflecting its prewar production level. Mines, such as Penn Mine, which were not operating in 1941 and therefore had no prewar metal production level, were assigned a "zero quota." Producers were paid an established ceiling price of 8–¼ cents per pound for all zinc produced up to their "quota" amount. All production over that quota was purchased at a premium price, initially 11 cents per pound. Under the Premium Price Plan, all zinc produced at zero quota mines was purchased directly by the MRC or by private entities, who were reimbursed by MRC at prevailing premium prices. This series of price supports encouraged the owners of previously unexploited zinc deposits (who would receive a zero quota) to open deposits and begin production. R.S. ¶¶ 42–47.

At the recommendation of the WPB and OPA, the Premium Price Plan was expanded, effective January 1, 1943. This Plan provided for an additional subsidy above the 11 cents per pound previously authorized. The WPB and OPA were authorized to assign special quotas, with additional subsidies, to producers who would not otherwise receive adequate revenue to maintain needed production. The "B" quota authorized an additional subsidy of 5–½ cents per pound; the "C" quota, 8–¼ cents per pound. R.S. ¶¶ 48–50, 80–81.

The Premium Price Plan expired on June 30, 1946, but was reenacted by Congress, retroactively, and extended to June 30, 1947. In addition, a new class of premiums was established to encourage exploration. The

RFC administered this revived Premium Price Plan. R.S. ¶ 91.

## B. Wartime Activities and Penn Mine

In March 1942, the Penn Mining Company, which owned Penn Mine, applied for federal financial assistance to return the mine to operation as a zinc mine. Although the funding was authorized, the project never went forward.

Eagle Shawmut Mine ("Shawmut") operated a gold mine located within 75 miles of Penn Mine. On October 8, 1942, the WPB ordered the closing of all non-essential gold mines, including Shawmut's. Shawmut originally intended to close its gold mine. However, the gold mine was not closed and continued to operate throughout World War II.

Seven months after the WPB Order to close its gold mine, but while the mine was still operating, Shawmut leased Penn Mine from the Penn Mining Company and applied for federal assistance to rehabilitate Penn Mine for zinc mining purposes. The WPB authorized financial assistance to Shawmut in the amount of $80,000, which was later increased to $120,000. Penn Mine was one of fourteen zinc mining projects approved to receive federal funds. R.S. ¶¶ 40, 55, 70–71.

In June 1943, the MRC entered into a contract with Shawmut to purchase the entire output of zinc concentrates produced by Penn Mine, up to 10,000 tons. The contract between the parties provided that the "Seller is willing to sell ... provided Buyer advances to Seller the sum recommended by the War Production Board." Shawmut retained the right to prepay its WPB loan at any time and to cancel the contract. If Shawmut breached the contract in any way, the MRC's only remedy was cancellation of the contract. The contract specified price variations according to the zinc metal content and provided for minimum metal content in the ore. It also specified the subsidies to be paid by the smelter under the Premium Price Plan, and the delivery schedule. Shawmut was required to establish a 48-hour work week in compliance with the WMC Order. The contract required that Shawmut furnish MRC with a copy of the lease for Penn Mine and gave MRC the right to request information and data concerning Shawmut's operations and to inspect or audit its books. The contract stated that the mine's rehabilitation and operation were to be carried out by Shawmut. The contract did not provide for government supervision or operation of rehabilitation or mining activities. R.S. ¶ 75; Documents PMD 6407–6412 and PMD 6876 (Attached as Exhibits to Plaintiff's Motion for Partial Summary Judgment).

Shawmut began pumping water out of the inoperative Penn Mine in the summer of 1943. Shawmut's lease with the Penn Mining Co. obligated it to dispose of waste water to avoid stream pollution or environmental damage. R.S. ¶¶ 76–77. The Penn Mining Co. (not Shawmut) had indicated that, during normal mine operations, waste water could be lawfully discharged after being passed through a copper precipitating plant. A provision in the Shawmut–Penn Mining Co. lease, provided to the MRC under the terms of the zinc sales contract, indicated that waste water from mining operations contained chemicals that could be harmful to the nearby Mokelumne River. However, the lease also required that Shawmut take the necessary steps to purify the water to such an extent that there would be no complaint from state officials or other users of the river. R.S. ¶ 103.

Penn Mine received a "zero" quota under the Premium Price Plan. Thus, every ton of zinc concentrates produced from ore mined at Penn Mine was paid for by government subsidies. More than one-half of all domestic zinc production received such premiums. Mining began in 1944 and, by July 1944, the WPB authorized the additional "B" quota premium. Finally, in January 1945, the WPB authorized a higher premium to be paid for Penn Mine zinc under the "C" quota. Shawmut thus received twice the ceiling price for its zinc concentrates. Penn Mine was one of 57 zinc mines to receive the "C" quota rating. R.S. ¶¶ 79–82.

The government's wartime labor policies also affected Penn Mine. Penn Mine initially received an Urgency Rating of V. By February 1945, its Urgency Rating was raised to

III. On April 5, 1945, the National Manpower Priority Committee assigned a Category 1 manpower priority rating to govern all requests for workers by Penn Mine. Penn Mine was one of only five Northern California establishments whose manpower orders received a Category 1 rating. R.S. ¶¶ 83–86.

Poor housing conditions in the area and poor working conditions in the mines led to high worker turnover at Penn Mine. There is no evidence as to whether any referrals to Penn Mine were made by the U.S. Employment Service prior to 1945, or the effect of any such referrals. The U.S. Employment Service referred fifteen workers to Penn Mine in January 1945, thirteen in February, and five in March. All were hired. Despite these referrals, quits still exceeded hires. By April 1945, there was still a shortage of workers and the mine lagged behind its production schedule. After an on-site visit, a WMC official reported that the labor shortage was affecting production. The U.S. Employment Service referred nineteen more workers in April and eighty in May. Only twenty-seven of these workers were hired and the WMC continued to list Penn Mine as in need of additional labor. R.S. ¶¶ 87–90. There is no evidence that any of these referred workers had previously worked at gold mines and, thus, became available as zinc mining labor only as a result of the government order closing non-essential gold mines.

There is no evidence that the government had any day-to-day, on-site presence at the mine, or that it was involved in operational activities. There is no evidence that the government physically rehabilitated Penn Mine, disciplined or discharged Penn Mine's employees or managers, inspected or approved the ores extracted from Penn Mine, dictated how the operators at Penn Mine were to use equipment, facilities or workforce on a day-to-day basis, or required the operators of Penn Mine to use any particular waste disposal method or particular technology for the disposal or treatment of waste at Penn Mine. There is no evidence that the government sat on any board of directors of either Penn Mine or Shawmut.

## C. Post–War Activities and Penn Mine

In December 1945, after the MRC contract was terminated, Shawmut's loan was repaid, and the war was over, a newly formed company that leased Penn Mine from the Penn Mining Co. applied for an exploration premium under the revived Premium Price Plan. The principals of that company, Shawmut Copper Mine Company ("Shawmut Copper"), were the same persons who were involved in Shawmut's previous zinc mining efforts at Penn Mine. Their application was granted and, in February 1947, the RFC disbursed more than $100,000 to Shawmut Copper for exploration at Penn Mine. R.S. ¶¶ 91–93.

In 1948, Shawmut Copper stated that the 1947 exploration work was done primarily to benefit the government, and that it was not possible for it or the Penn Mining Co. to derive a benefit from the monies expended. After President Harry S. Truman vetoed the Premium Price Plan extension bill, the Exploration Project was terminated, the lessees abandoned the lease, and the mine was shut down. In November 1947, shortly after Penn Mine closed, an engineer employed by the RFC inspected the site. This inspection was related to a financial audit for purposes of evaluating Shawmut Copper's accounts of work under the Exploration program. The mine was subsequently reopened in 1949 by a private company, using private funds, and operated for four years. R.S. ¶¶ 94–95, 100.

## III. *Standard of Review*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c) Fed.R.Civ.P. In considering a summary judgment motion, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir. 1989).

Material facts are those that "might affect the outcome of the suit" and are determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment must be granted against a party who has failed to make a showing sufficient to establish the existence of an element essential to that party's case on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Neither "[u]nsupported speculation", *see Ash v. United Parcel Serv.,* 800 F.2d 409, 411–12 (4th Cir.1986), nor "a bare opinion or unaided claim that a factual controversy persists" can defeat a motion for summary judgment. *Alyeska Pipeline Serv. v. United States E.P.A.,* 856 F.2d 309, 314 (D.C.Cir. 1988). A genuine issue of material fact is one with a real basis in the record such that a reasonable fact-finer could return a verdict for the non moving party. *Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987).

## IV. Discussion

Plaintiff argues that, as a matter of law, the federal government's activities in connection with operation of the Penn Mine render it an "operator" of the mine and an "arranger" of disposal of waste under CERCLA. Defendants advance two reasons for their argument that they cannot be held liable for the environmental damage here at issue. First, Defendants argue that CERCLA's waiver of sovereign immunity does not extend to the purely governmental activities at issue here. Second, they argue that, even if sovereign immunity is waived, they cannot be held liable as an operator or an arranger under existing CERCLA case law. Because a conclusion that federal sovereign immunity shields Defendants from liability would preclude discussion of the operator and arranger standards, the Court will address this threshold inquiry first.

### A. Sovereign Immunity

■ CERCLA expressly provides that the federal government can be held liable for environmental damage. 42 U.S.C. §§ 9601(21), 9620(a)(1). *See Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 10, 109 S.Ct. 2273, 2279, 105 L.Ed.2d 1 (1989), *overruled on other grounds by Seminole Tribe of Fla. v. Florida,* —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (comparing waivers of state and federal sovereign immunity under CERCLA); *FMC Corp. v. United States Dep't of Commerce,* 29 F.3d 833 (3d Cir.1994) (en banc); *United States v. Iron Mountain Mines, Inc.,* 881 F.Supp. 1432 (E.D.Cal.1995). The issue before the Court is the scope of that waiver.

Defendants contend that the government cannot be held liable for activities for which there is no private analogue, such as regulation. They rely on a line of cases that, they claim, hold that the federal government's regulatory activities cannot subject it to liability under CERCLA. *United States v. Dart Indus.,* 847 F.2d 144, 146 (4th Cir.1988); *In re Paoli R.R. Yard PCB Litig.,* 790 F.Supp. 94 (E.D.Pa.) ("Paoli R.R."), *aff'd,* 980 F.2d 724 (3d Cir.1992); *United States v. Atlas Minerals and Chems., Inc.,* 797 F.Supp. 411 (E.D.Pa.1992); *United States v. New Castle County,* 727 F.Supp. 854 (D.Del.1989). Although it is true that these cases do not impose CERCLA liability on the government, a close reading of them shows that Defendants' interpretation of their holdings is overbroad.

*Atlas Minerals* and *Paoli R.R.* are inapposite because they arose in a completely different factual context. Those cases addressed the United States' liability with respect to additional environmental damage caused by the EPA's negligent clean up activities. The courts looked specifically at the language of the statute and determined that CERCLA provided an exemption from liability for remedial actions taken by the government. Although it is true that the opinions in those two cases referred to the activities as "regulatory" or "governmental", the holdings and reasoning of those cases are clearly based on the specific clean up activities at issue. *Atlas Minerals,* 797 F.Supp. at 420 ("The ... waiver does not extend to situations in which the [government] has undertaken response or remedial actions."); *Paoli RR,* 790 F.Supp. at 97 (the government was

not acting like a private party because "[n]o private party is obligated to perform such remedial operations under CERCLA").

Further, Defendants' reliance on *Dart Industries* and *New Castle County* is also misplaced. Neither case specifically addressed sovereign immunity. Rather, both cases applied established CERCLA liability standards to their individual fact situations and concluded that the state was not an operator of a facility, nor had it arranged for the disposal of waste. *Dart Indus.*, 847 F.2d at 144 ("DHEC is not and never has been an owner or operator of the site in question."); *New Castle County*, 727 F.Supp. at 864–75. The threshold issue of sovereign immunity was simply not discussed.

The Third Circuit's thorough analysis in *FMC Corporation* underscores the weakness of Defendants' argument. Like the present case, *FMC Corporation* involved the activities of the WPB and other agencies relating to procurement and production of goods for the war effort. *FMC Corp.*, 29 F.3d at 835.

In determining that no *per se* rule shields the government from liability for its regulatory activities, the court first parsed the text of CERCLA. Initially, it noted that the plain language of section 9620(a)(1) "does not state that regulatory activities cannot form the basis of liability." *FMC Corp.*, 29 F.3d at 840. *See also Iron Mountain Mines*, 881 F.Supp. at 1442 ("CERCLA does not incorporate such an immunity by its plain language and the court declines to create such an exemption where Congress has not done so and in the face of clear statutory language subjecting government entities to liability."). Second, section 9607 lists three exclusive defenses to liability under CERCLA, none of which is a regulatory activities defense. *FMC Corp.*, 29 F.3d at 841. Finally, the statute provides a special immunity for state or local governments conducting clean up activities during an environmental emergency. *Id.* The court construed this provision as evidence that Congress intended to exempt the government from CERCLA liability for only this special category of regulatory

activity, but not for all regulatory activities. *Id.*

The second basis for the court's broad reading of the sovereign immunity provision was public policy. The court noted that CERCLA is a remedial statute which should be construed liberally to effectuate its goals of making those responsible for environmental damage bear the costs of cleaning it up. *Id.* at 840 (citations omitted). Other courts have similarly construed CERCLA's purpose. *See e.g., Foster v. United States*, 922 F.Supp. 642 (D.D.C.1996); *United States v. Alcan Aluminum Corp.*, 990 F.2d 711 (2d Cir.1993); *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373 (8th Cir.1989); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805 F.2d 1074 (1st Cir.1986). The court found that a regulatory exception to the waiver of sovereign immunity would be inconsistent with CERCLA's remedial purpose. *FMC Corp.*, 29 F.3d at 840.

This Court finds the Third Circuit's analysis persuasive. There may be circumstances under which government regulation of a particular industry or company is so pervasive and focused that the company is, effectively, a "subsidiary" of the government. In such a situation, the government should not be able to hide behind the shield of sovereign immunity simply because its activities may be characterized as regulatory. Such a finding is in accord with the Supreme Court's discussion of the scope of the CERCLA sovereign immunity waiver in *Union Gas, supra*, 491 U.S. at 10, 109 S.Ct. at 2279 (CERCLA language is "an unequivoca[l] express[ion] of the Federal Government's waiver of its own sovereign immunity, since we cannot imagine any other plausible explanation for this unequivocal language.") (citations and internal quotations omitted).[7]

The Court's reading of the text of CERCLA and its legislative history supports the view that Congress has fully abrogated the federal government's immunity, except as specifically provided for in the statute.

---

7. The Court notes that the Supreme Court has explicitly rejected Defendants' argument with respect to the Federal Tort Claims Act, which has a waiver provision similar to CERCLA's. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

As initially enacted, CERCLA contained a general waiver of the federal government's sovereign immunity under the broad heading of "Liability," but did not specify the scope of that waiver. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub.L. No. 96–510, 94 Stat. 2767, 2781 (1980) (codified at 42 U.S.C. § 9607(g) (1976 & Supp.V.1980)). In 1986, Congress passed amendments to CERCLA. Superfund Amendments and Reauthorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613 (1986) ("SARA"). These Amendments were designed, in part, to bring federal facilities into compliance with CERCLA. *See, e.g.,* S.Rep. No. 99–11, at 61 (1985) (purpose of amendment is to "improve Federal agency accountability . . . with respect to hazardous waste sited on Federally-owned or controlled facilities or property"); H.R.Rep. No. 99–253(I), at 54 (1985) U.S.Code Cong. & Admin.News 1986, pp. 2835, 2836. (bill will "insure the cleanup of waste sites owned by the Federal government").

During the passing of SARA, Congress rearranged CERCLA. In this process, the general waiver of the federal government's sovereign immunity, initially codified at 42 U.S.C. § 9607(g), was moved to a new section entitled "Federal Facilities." *Id.* § 9620. Current Section 9607(g) indicates that "provisions relating to Federal agencies" are set forth at Section 9620. *Id.* § 9607(g). Despite having the narrow title "Federal Facilities," the section actually covers the general applicability of CERCLA to the entire federal government, and provides:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, *including liability under section 9607 of this title.*

*Id.* § 9620(a)(1) (emphasis added). Although the waiver provision was moved from the general liability section, it nonetheless specifically indicates that liability is to be imposed fully on the government under section 9607, which sets forth the bases for CERCLA liability. *Id.* Section 9607(a), in turn, specifically indicates that liability is imposed "[n]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in . . . this section." *Id.* § 9607(a). None of the defenses set forth in Section 9607 is an immunity or regulatory defense.

Further, the legislative materials accompanying SARA do not evidence any Congressional intent to limit federal liability. According to the House Report accompanying SARA, "new" subsection 9620 would ensure that the federal government would be liable to the full extent as private parties under section 9607 and provided that CERCLA provisions would be "applicable with respect to facilities which are owned or operated by a department, agency or instrumentality of the United States in the same manner and to the same extent that they are applicable with respect to other facilities." H.Rep. No. 99–253(V), at 47 U.S.Code Cong. & Admin.News 1986, p. 3170. Thus, the intent of Congress in amending CERCLA was to expand the federal government's liability, not limit it. *Accord, FMC Corp.,* 29 F.3d at 842.

For these reasons, the Court holds that sovereign immunity does not protect the federal government from liability for regulatory activities that cause environmental damage if the government otherwise meets the CERCLA liability standards. Thus, Defendants' argument that they cannot be held liable under principles of sovereign immunity is rejected.

## B. Operator and Arranger Liability

Under CERCLA, there are four classes of responsible persons who may be held liable for the costs of cleaning up hazardous waste, two of which are relevant here. One class includes those persons who operated a facility at the time hazardous substances were disposed of. 42 U.S.C. § 9607(a)(2). Another class includes those persons who "by contract, agreement, or otherwise arranged for disposal or treatment . . . of hazardous substances owned or possessed by such person by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances." *Id.* § 9607(a)(3).

The statute itself gives little guidance as to when a responsible person is an operator or arranger. Consequently, the courts have developed their own standards for imposing such liability. Neither issue has been squarely addressed by this Circuit. Although the inquiry is intensely fact-based, courts have routinely decided the issues on summary judgment. *See e.g., United States v. Vertac Chem. Corp.,* 841 F.Supp. 884 (E.D.Ark.1993), *aff'd,* 46 F.3d 803 (8th Cir. 1995), *cert. denied sub nom., Hercules, Inc. v. United States,* — U.S. —, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995); *Washington v. United States,* 930 F.Supp. 474 (W.D.Wash. 1996); *Maxus Energy Corp. v. United States,* 898 F.Supp. 399 (N.D.Tex.1995), *aff'd without opinion,* 95 F.3d 1148 (5th Cir.1996).

### 1. Operator Liability

Plaintiff argues that, but for the government's wartime regulation, Penn Mine would not have been rehabilitated as an active zinc mine. Therefore, according to Plaintiff, the government's policies made it an operator of the mine. While Plaintiff's argument is not wholly without force, it gives too broad a reading to the CERCLA liability standards. No court has held that CERCLA's statutory operator test is a simple "but-for" one, and this Court finds no support for imposing such a standard in either the case law or the legislative history.

Courts have imposed operator liability under two alternative tests. First, operator liability may result from actual or substantial control over a facility, with active involvement in its activities. *FMC Corp.,* 29 F.3d at 843. *Accord Vertac Chem. Corp.,* 46 F.3d 803. Second, operator liability may attach if the party in question has the authority to control the operations of a facility or decisions involving the disposal of hazardous waste. *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.1992), *cert. denied sub nom., Mumaw v. Nurad, Inc.,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992).[8] Under either theory, Defendants' conduct does not meet the standard for CERCLA operator liability.

### a. Actual or Substantial Control

Both the Third and Eighth Circuits, as well as several district courts, have adopted the "actual or substantial" control test, *see FMC Corp.,* 29 F.3d 833; *Vertac Chem. Corp.,* 46 F.3d 803. This inquiry is fact intensive and requires the court to look not at one factor, but to consider the totality of the circumstances. *FMC Corp.,* 29 F.3d at 845; *Vertac Chem. Corp.,* 46 F.3d at 808. *FMC Corporation* was the first case to impose liability on the federal government for activities similar to those at issue here and its rationale is instructive.

In *FMC Corporation,* the Third Circuit upheld the district court's decision, after trial, to attribute liability to the government. Applying the actual control test, the appellate court pointed to the following facts as establishing government liability:

> The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product.

*FMC Corp.,* 29 F.3d at 843. In particular, the court pointed to the government's decision as to what products would be produced, the level of production, the price, and to whom the product would be sold as "leading indicia of control." *Id.*

Plaintiff contends that *FMC Corporation* dictates a finding in this case that the government operated Penn Mine, within the meaning of CERCLA, during World War II. The Court does not agree.

In this case, unlike the factual situation in *FMC Corporation,* the government's regula-

---

**8.** One court has refused to distinguish between the two standards, stating that they are not inconsistent and that "[a]ctive involvement in the activity that produces the contamination is what is required for 'operator' liability." *Washington v. United States,* 930 F.Supp. at 483.

tory efforts were not directed specifically at Penn Mine, but, rather, were aimed at directing the wartime economy in general. The indicia of control listed above that the Third Circuit found so compelling are largely absent here. The government did not have control over what products would be produced at the Penn Mine, except to the extent that Shawmut had contracted to sell zinc to the MRC. The government did encourage production of particular metals, but on a macro-economic scale, not with respect to this particular mine. This is significantly different from *FMC Corporation*, where the government ordered that specific textile mill to produce a particular kind of fiber. *Id.* at 836. The government did not dictate Penn Mine's production level. To the extent that it affected that production level to any extent, it was the result of a consensual, contractual agreement with Shawmut.[9] Although price regulations were in effect, they applied to the ferrous metals industry as a whole and not specifically to Penn Mine. In fact, the subsidies received by Shawmut under the "C" quota were in effect for fifty-six other zinc mines. Shawmut's inability to sell zinc to other purchasers resulted from its voluntary output contract with the United States, not from any prohibition imposed by the United States government.

Most tellingly absent is any direct control over, or interaction with, the Penn Mine workforce. Plaintiff relies heavily on arguments relating to government regulation of the labor supply. Whatever the net effect of these activities on Penn Mine, it clearly falls far short of the government's activities in *FMC Corporation*. Even though the government referred workers to Penn Mine, it did not force Shawmut to hire those referred workers.[10] Occupational draft deferments may have helped Penn Mine find workers, but those deferments were given to workers in other essential industries as well. The government did not hire, fire, or otherwise discipline workers.

Moreover, there is simply no support for Plaintiff's speculation that the closing of Shawmut's gold mine provided needed labor and equipment for the operation of Penn Mine. This argument is particularly untenable in light of the fact that Shawmut never actually closed its gold mine. Shawmut's gold mining operations and its zinc operations at Penn Mine remained entirely separate during the time period at issue. Thus, the "leading indicia of control" that the court found persuasive in *FMC Corporation* are not present here. *See Maxus Energy Corp.*, 898 F.Supp. at 408 (no actual control where government did not stipulate production processes, did not hire, fire, discipline, or manage plant personnel, and was not consulted by the company regarding the manner of waste disposal).

The Third Circuit, however, cautioned that no factor is "dispositive . . . each is important only to the extent it is evidence of substantial, actual control." *Id.* at 843. *See also Washington v. United States*, 930 F.Supp. at 484 (citing *FMC Corp.*). Seizing on this concept, Plaintiff attempts to turn government regulation aimed at an entire industry during wartime into a virtual seizure of Penn Mine. However, none of the government's involvement rises to the level of day to day government interaction with the on-going business of the mine. *See id.* at 483. The government did not seek out Shawmut and force, or even ask, them to reestablish mining operations. It did fund the Penn Mine's re-opening by providing a loan, but it provided such funding to thirteen other non-ferrous mines.[11] The government did not decide how the zinc was to be extracted from the soil. It did not provide equipment to the Penn Mine. The government did not accord Penn Mine any individualized benefits or special treatment. In short, the fact that government programs were made available to all mining entities, and then taken advantage of by

9. In fact, production at Penn Mine continually lagged. At the time the contract was terminated, Shawmut had delivered 3,000 tons less than anticipated. R.S. ¶¶ 80, 82, 88.

10. In April and May of 1945, the U.S. Employment Service referred ninety-nine workers to Penn Mine but, despite the severe labor shortage, Shawmut hired only twenty-seven of them.

11. Defendants contend, and Plaintiff does not dispute, that Shawmut invested a significant amount of its own money, $400,000, in the Penn Mine venture.

Shawmut to re-open the Penn Mine for zinc mining, does not convert the government into an operator of Penn Mine within the meaning of CERCLA.

The Eighth Circuit's application of the actual control test is also instructive. In *Vertac Chemical Corporation*, an herbicide manufacturer sued the U.S. government to recover the costs of a clean up related, in part, to the manufacture of Agent Orange. At the time of the chemical's manufacture, the government issued directives to the manufacturer controlling output. Significant contract specifications were "substantially dictated" by the Department of Defense. *Vertac Chem. Corp.*, 46 F.3d at 806–07. When the manufacturer could not obtain enough raw materials to maintain these production requirements, the government waived import duties on the raw materials, and directed a supplier to provide raw materials to the manufacturer. *Id.* On cross-motions for summary judgment, the court, relying on *FMC Corporation*, declined to extend operator liability to the government. Since the government was far more directly involved in the day-to-day operations of the manufacturing in *Vertac Chemical Corporation* than it was in the operations of Penn Mine, it follows that the government is entitled to summary judgment in this case.

Several factors which are present in the instant case led the *Vertac Chemical Corporation* court to a finding that the federal government had not exercised actual control over the manufacturer. First, the manufacturer had chosen to bid for the contracts, so any change in its manufacturing processes as a result of obtaining those contracts was a product of its own actions. *Id.* at 809. The Penn Mine situation is similar, as the government did not order Penn Mine to begin producing zinc, nor did it specify the processes to use. The changes Shawmut made to the mine resulted from its desire to meet its contractual obligations, not from a direct government order. Further, in *Vertac Chemical Corporation*, no United States employee or representative ever managed or supervised the manufacturing employees. *Id.* That was also true at Penn Mine. Finally, even the fact that the manufacturer

was subject to various government regulations and on-site inspections to insure compliance was insufficient to establish government control. *Id.* (citing *Dart Indus.*, 847 F.2d 144; *New Castle County*, 727 F.Supp. 854). In this case, although Penn Mine was subject to wartime pricing and output regulations, they were significantly less pervasive than the on-site regulatory inspections in *Vertac Chemical Corporation.*

Finally, in a situation almost indistinguishable from the present case, *Iron Mountain Mines*, 881 F.Supp. 1432, the court was faced with a claim of operator liability based on the same regulatory scheme at issue here. The court found that "[a]lthough the United States played the role of a very interested consumer during the War," the plaintiff's allegations regarding the government's role fell far short of the government's involvement with the plant in *FMC Corporation. Iron Mountain Mines*, 881 F.Supp. at 1449–50. The critical reason that the complaint failed was that it lacked any allegations of the government's day-to-day involvement with the mine or decision making with respect to waste disposal. *Id.* at 1450 (citations omitted). Similarly, the undisputed facts of this case do not demonstrate the required day to day involvement in Penn Mine's operations.

Plaintiff argues that it has alleged significant government action directed specifically at Penn Mine. Plaintiff points to the loan provided to Shawmut, the subsidies that applied to Penn Mine's entire zinc output, and the government's regulation of the work force through ratings and draft deferments. First, even if government financing and subsidies helped make it possible for Penn Mine to operate, that does not make the government an operator of the mine. There is no evidence that Congress intended subsidies alone to subject the government to potentially limitless liability under CERCLA and there is no case law so holding. While it is true that CERCLA is generally interpreted broadly to effectuate its remedial purpose, Congress cannot have intended that any type of societal benefit realized by government regulation expose the government to liability. *See New Castle County*, 727 F.Supp. 854,

864–65 (recognizing that the government, and every member of society, benefits from treatment and cleanup of hazardous waste, but analyzing the legislative history and case law to conclude that some more specific type benefit is required to impose CERCLA liability).

Second, the manpower priority system which Plaintiff points to as a major government program giving the government control over Penn Mine had little effect on Penn Mine, as it affected only six actual job openings.

Wartime regulations did affect Penn Mine. However, that did not make it unique. Penn Mine, quite simply, took advantage of many government programs available to all mines. The government engaged in classic economic regulation by providing financial incentives to private industry to meet wartime production goals. Had these incentives failed, the government could simply have purchased or leased its own zinc mine. It would then have been an operator. However, simply because the government was able to achieve its goals indirectly by using economic incentives does not, under CERCLA, make it directly liable.

The Court recognizes the appeal of Plaintiff's equitable argument that it is unfair for EBMUD, and the small number of taxpayers whose tax dollars fund it, to bear the costs of the Penn Mine cleanup. However, the contours of CERCLA liability must be established by Congressional action. It is not for this Court to depart from clearly stated Congressional policy to satisfy Plaintiff's equitable claims. If there is indeed inequity in the statute, Plaintiff must look to Congress to remedy it, not the courts. Finally, the court may properly consider equitable considerations in the damage allocation phase of a CERCLA case, not the liability phase. *See Atlas Minerals*, 797 F.Supp. 411, 417 (E.D.Pa.1992) (citing *United States v. Stringfellow*, 661 F.Supp. 1053, 1058 (C.D.Cal. 1987)); 42 U.S.C. § 9613(f)(1).

Thus, Plaintiff has failed to demonstrate that the government exercised that degree of "actual control" over Penn Mine required to render it an operator under CERCLA.

### b. Authority to Control

Plaintiff argues, alternatively, that the "authority to control" test should apply to establish that the government operated the mine. That test was articulated in *Nurad v. William E. Hooper & Sons, Co.*, 966 F.2d 837. No court has yet applied this standard in the context of government liability. However, even under this test, Defendant's actions do not, as a matter of law, subject the government to liability as an operator. In *Nurad*, the court held that "a party who possessed the authority to abate the damage caused by the disposal of hazardous substances but who declined to actually exercise that authority by undertaking efforts at a cleanup" is liable under CERCLA. *Id.* at 842.

Plaintiff argues that the government regulation at issue was so pervasive that the government had constructive authority to control production of zinc at Penn Mine. In making that argument, Plaintiff emphasizes the government's authority to seize production facilities, even though it did not actually do so. It argues that such an authority equates with control because such a regulatory scheme was more effective in maintaining production than a seizure would be. What Plaintiff does not address, however, is that general authority to control operation of the facility is not the relevant legal standard. The authority to control must be specifically related to the control of waste disposal. *Nurad*, 966 F.2d at 842. *See also Maxus Energy Corp.*, 898 F.Supp. at 408.

*Idaho v. Bunker Hill Co.*, 635 F.Supp. 665 (D.Idaho 1986), provides a useful framework for applying the authority to control standard. On cross-motions for summary judgment, the court looked at three factors to determine a parent company's liability for environmental damage caused by a subsidiary. "The owner-operator ... has the capacity to make timely discovery ... power to direct the activities of persons who control the mechanisms causing the pollution ... the capacity to prevent and abate damage." *Bunker Hill*, 635 F.Supp. at 672 (citations omitted).

In *Bunker Hill*, the parent corporation was liable because all three indicia of authori-

ty were present. First, the parent company was in a position to be, and was, "intimately familiar with hazardous waste disposal and releases" at the facility. *Id.* at 672. In the present case, the government did not have similar familiarity. Although the government was provided with a copy of the Shawmut–Penn Mining Co. lease, which indicated that the mining produced toxic chemicals, it was also told by the Penn Mining Company that any environmental damage could be abated. R.S. ¶ 103. Further, the fact that two government representatives visited the mine site and could have seen the waste on the premises cannot serve as the basis for familiarity with waste disposal operations at Penn Mine. First, neither of those visits were related to production methods or environmental concerns. One government agent examined manpower needs; the other was conducting a financial audit. R.S. ¶¶ 88, 100. There is no evidence in the record that either representative toured the facility, was actually exposed to the waste, had any technical or environmental knowledge, or would have known that rocky debris scattered around the site had the potential to produce toxic runoff.

In evaluating the parent company's capacity to control the pollution or to prevent and abate damage, the *Bunker Hill* court pointed to several factors. First, the subsidiary was not allowed to spend more than $500 dollars on pollution matters or make capital expenditures without direct approval from the parent company. *Id.* This level of control was not present at Penn Mine. The government did not dictate how Shawmut was to allocate resources in its mining operations nor did it specify how Shawmut was to control any pollution caused by mining activities. Second, the parent controlled a majority of the subsidiary's board of directors and obtained weekly reports on the day-to-day aspects of the subsidiary's operations. *Id.* Again, the government was not so involved in Penn Mine's operations. No member of the government sat on the board of directors of either Shawmut or Penn Mining Co. Although the government, under the sales contract, could request operational reports, there is no evidence that the government took even this minimal step. Thus, the

Court is unable to conclude that the government had control over Penn Mine's waste disposal.

Under the undisputed material facts of the present case, the Court concludes that Defendants cannot be held liable as an operator of a facility under the "authority to control" test.

### 2. Arranger Liability

■ Arranger liability is imposed on "any person who by contract, agreement, or otherwise, arranged for disposal or treatment ... of hazardous substances owned or possessed by such person." 42 U.S.C. § 9607(a)(3). To prevail on summary judgment, the Plaintiff must prove, *inter alia*, that Defendants both arranged for disposal of hazardous waste and owned or possessed that waste. *See, e.g., Vertac Chem. Corp.*, 46 F.3d at 810; *United States v. Northeastern Pharmaceutical & Chem. Co., Inc.*, 810 F.2d 726, 743–44 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *General Elec. Co. v. AAMCO Transmissions, Inc.*, 962 F.2d 281, 285–86 (2d Cir.1992) (per curiam). The facts of this case show that the United States has done neither.

■ Plaintiff misreads the case law when it states that "authority to control the handling and disposal of hazardous substances" is the only requirement for arranger liability. Plaintiff's Motion for Summary Judgment at 33. Because of its misapprehension of the correct legal standard on this issue, Plaintiff does not allege that the United States owned or possessed the hazardous substance at issue, but merely states that such ownership or possession is not required. It is true that the ownership or possession need not be actual, but some constructive control over the physical waste itself is required. *Northeastern Pharmaceutical*, 810 F.2d at 743–44 (plant supervisor "possessed" the hazardous substances because he "knew about, had immediate supervision over, and was directly responsible for arranging for the transportation and disposal" of the plant's waste). Such control is not present here.

In *Vertac Chemical Corporation*, the court addressed the government's constructive possession of chemicals used in the production of

Agent Orange. First, it stated that, "[a] governmental entity may not be found to have owned or possessed hazardous substances under § 9607(a)(3) merely because it had statutory or regulatory authority to control activities which involved the production, treatment or disposal of hazardous substances." *Vertac Chem. Corp.*, 46 F.3d at 810. The court did not rule out the possibility that there could be circumstances where government regulation and intervention were sufficiently pervasive to justify imposition of liability. However, the court found that the amount of regulation involved in the manufacture of Agent Orange was not sufficient to meet that standard. *Id.* at 810–11. As discussed earlier, the quantum of regulation in *Vertac Chemical Corporation* was certainly more pervasive and specifically focused on the manufacturer than the government's regulatory activities that affected Penn Mine. *See* discussion *supra* Section IV.B.1.a. *Accord Iron Mountain Mines*, 881 F.Supp. at 1451.

The court then addressed the contractual relationship between the manufacturer and the United States as a basis for finding constructive possession. Again, the court did not rule out the possibility that a government contract might exist which was sufficiently coercive to render the government liable as an arranger. However, the voluntariness of the contract, the profit made from it, the relationship of buyer and seller, and the manufacturer's participation in the negotiation process all militated against contractual liability. *Vertac Chem. Corp.*, 46 F.3d at 810–11. The contract at issue in this case is similar. The Shawmut–MRC contract was a purely voluntary output contract. If Shawmut had failed to perform, the contract provided that the government had no special remedies, but could only cancel the contract. The contract was bargained for and contained provisions specific to Shawmut and Penn Mine. Thus, the Court concludes that, here, as in *Vertac Chemical Corporation,* the government's contract with Shawmut did not give it constructive possession of hazardous waste at the Penn Mine site.

The Court now turns to the issue of whether the government arranged for disposal of waste. Plaintiff's argument rests primarily on the proposition that, because the government could have put a provision relating to waste disposal in its contract with Shawmut (as it had in its unconsummated loan agreement with the Penn Mining Co.), it had the authority to control the disposal of waste water at Penn Mine. This contention must be rejected for two reasons.

■ First, although a party need not be actively involved in waste disposal to be an arranger, there must be a nexus between the allegedly liable party and the actual disposal. *General Electric Co.*, 962 F.2d at 286. As the Second Circuit pointed out in *General Electric Company,* most courts that have found arranger liability have found some actual involvement in the disposal or an obligation to dispose of or direct disposal of the waste. *Id.* (citing *United States v. Bliss,* 667 F.Supp. 1298, 1306 (E.D.Mo.1987) (defendant made disposal decisions); *United States v. Ward,* 618 F.Supp. 884, 894–95 (E.D.N.C. 1985) (defendant who decided to dispose of the waste liable even if he were unaware of the final disposal site); *CPC Int'l, Inc. v. Aerojet–General Corp.,* 759 F.Supp. 1269, 1278 (W.D.Mich.1991) ("nexus issue is ... whether the party assumed responsibility for determining their fate")). *See also Iron Mountain Mines,* 881 F.Supp. at 1451. Such a nexus is not present here. The United States was not involved in any decisions regarding how the mine should be readied for production; nor did it assume any obligation to dispose of the waste water during the readying of the mine for production or during mine operations. Those decisions and obligations were assumed solely by Shawmut.

Second, the Second Circuit also said in *General Electric Company,* that "the mere existence of economic bargaining power which would permit one party to impose certain terms and conditions on another, does not itself create an obligation under CERCLA." *Id.* at 286 (citation omitted). That statement echoes the persuasive reasoning of the *Vertac Chemical Corporation* court in relation to the issue of possession. No matter how the Plaintiff tries to characterize the contract, it is undisputed that it was a voluntary contract, entered into for mutual bene-

fit. The fact that the government failed to insist upon a provision relating to waste disposal in the Shawmut contract, which had been included in an unexecuted contract with a different party written the previous year, does not, as Plaintiff claims, underscore the government's obligation to make provisions for waste disposal in the contract with Shawmut. The government was under no obligation to dispose of waste and its failure to require Shawmut to do so in the absence of an affirmative contractual requirement does not make it liable. *Accord Iron Mountain Mines,* 881 F.Supp. at 1451.

The Court concludes that, under the facts of this case, Plaintiff has not made the necessary showing that the United States owned or possessed the raw mining materials or that it dictated the manner in which wastes were to be disposed or in some way controlled the disposal of those wastes. The government cannot, under the applicable CERCLA standards, be held liable as an arranger of waste disposal.

### V. *Conclusion*

The Court concludes that although Defendant is not shielded by sovereign immunity from CERCLA liability for regulatory activities, it cannot, under the facts of this case, be held liable as an operator or arranger. Thus, Plaintiff's Renewed Motion for Partial Summary Judgment is **denied** and Defendants' Renewed Motion for Summary Judgment is **granted.**