**MAXUS ENERGY CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 3:92–CV–1655–X.

United States District Court,
N.D. Texas,
Dallas Division.

Sept. 1, 1995.

As Corrected Dec. 5, 1995.

Frederick William Addison, III, Thomas Fredrick Loose, Bruce Knox Packard, Locke Purnell Rain Harrell, Dallas, TX, Michael M. Gordon, Cadwalader Wickersham & Taft, New York City, for Maxus Energy Corp.

Paula Mastropieri Billingsley, Vicki A. O'Meara, U.S. Attorney's Office, Department of Justice, Dallas, TX, John A. Sheehan, U.S. Department of Justice, Environment & Natural Resources Division, Washington, DC, Gary I. Rubin, Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

KENDALL, District Judge.

Before the Court are:

1) Plaintiff's Motion for Summary Judgment, filed July 15, 1994;

2) Defendant's Response, filed August 24, 1994;

3) Plaintiff's Reply, filed September 19, 1994;

4) Plaintiff's Supplemental Brief, filed December 9, 1994; and

5) Defendant's Response, filed December 15, 1994; and

6) Defendant's Motion for Summary Judgment, filed July 15, 1994;

7) Plaintiff's Response, filed August 24, 1994; and

8) Defendant's Reply, filed September 19, 1994.

After carefully considering the motions, briefs, supporting evidentiary submissions, and applicable law, the Court determines that no issues of material fact exist with respect to the issues raised in the motions for summary judgment. Therefore, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

## BACKGROUND

In this CERCLA[1] case, Plaintiff Maxus Energy Corporation ("Maxus") seeks to recover response costs and to obtain contribution from the United States concerning the cleanup of a Superfund Site. In August 1951, Diamond Alkali Company acquired a chemical manufacturing plant in Newark, New Jersey (the "Newark Plant").[2] Agricultural chemicals had been manufactured at the Newark Plant since the 1940s. From 1951 through July 1969, the Newark Plant manufactured a variety of materials, including phenoxy herbicides that included as active ingredients esters, amines or salts of 2,4–dichlorophenoxyacetic acid ("2,4–D") and/or 2,4,5–trichlorophenoxyacetic acid ("2,4,5–T").

During its ownership and operation of the Newark Plant, Diamond produced more than three dozen phenoxy herbicide products containing 2,4–D, 2,4,5–T, or a mixture of both for the commercial agricultural chemicals market. Phenoxy herbicide products containing 2,4,5–T were widely used in the United States during the 1950s and 1960s. Dia-

---

1. The Comprehensive Environmental Response, Compensation, and Liability Act, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 et seq. ("CERCLA").

2. Prior to September 1, 1983, Diamond Shamrock Corporation ("DSC–I"), which was known prior to December 19, 1967 as Diamond Alkali Company, was an operating company with divisions engaged in various businesses, including chemical manufacturing. On September 1, 1983, a holding company was formed which acquired 100% of the stock of DSC–I. The holding company adopted the name Diamond Shamrock Corporation ("DSC–II") and its subsidiary, DSC–I, changed its name to Diamond Shamrock Chemicals Company ("DSCC"). On September 4, 1986, DSC–II sold the outstanding stock of DSCC to an indirect, wholly-owned subsidiary of Occidental Petroleum Corporation. DSCC (as re-named) was later merged into Occidental Chemical Corporation ("Occidental"). In April 1987, DSC–II changed its name to Maxus.

As part of the sale of DSCC's stock in 1986, Maxus (then DSC–II) agreed to indemnify Occidental for, inter alia, the environmental response costs incurred at the Diamond Alkali Superfund Site, the location of the Newark Plant. The operating company known successively as Diamond Alkali Company. DSC–I and DSCC is hereinafter referred to as "Diamond".

mond sold products containing 2,4–D and 2,4,5–T to commercial customers prior to selling herbicides to the United States as well as after the government contracts were terminated.

The starting ingredients for Diamond's manufacture of 2,4,5–T were 1,2,4,5–tetra-chlorobenzene ("TCB"), caustic, and methanol. The starting ingredients for Diamond's manufacture of 2,4,5–T were mixed and heated in an autoclave reactor to produce the intermediate product sodium 2,4,5–trichloro-phenol ("trichlorophenol"). During this reaction step, 2,3,7,8–tetrachlorodibenzo–p–dioxin and related isomers (collectively, "dioxin") were formed in trace amounts as a result of unwanted side reactions that occurred in the autoclave. The generation of hazardous substances was inherent in the production process for phenoxy herbicides.

During the Vietnam war, the United States used herbicides to defoliate jungles and destroy crops in Southeast Asia as an integral part of its war strategy. To implement this strategy, the United States procured, through rated order contracts, a number of phenoxy herbicides from domestic manufacturers, the most widely used of which was a formulation known as "Agent Orange." From 1961 to 1968, Diamond produced and delivered to the United States over 820,000 gallons of Agent Orange pursuant to ten rated order contracts. The herbicides Diamond provided to its commercial customers were sold in a diluted form with inert ingredients, whereas the herbicides Diamond provided to the United States were sold in an undiluted form without any inert ingredients.

The United States assigned code names to four phenoxy herbicide formulations. Those code names were "Agent Orange" (50% the n-butyl ester of 2,4–D and 50% the n-butyl ester of 2,4,5–T with no inert ingredients), "Agent Pink" (approximately 60% the n-butyl ester of 2,4,5–T and 40% the iso-butyl ester of 2,4,5–T), "Agent Purple" (approximately 50% the n-butyl ester of 2,4–D, 30% the n-butyl ester of 2,4,5–T, and 20% the iso-octyl ester of 2,4,5–T), and "Agent Green" (100% the n-butyl ester of 2,4,5–T). Some of the dioxin present in the trichlorophenol carried forward into the 2,4,5–T acid, the 2,4,5–T ester and the Agent Orange.

From 1961 through 1964, Diamond accepted five contracts from the Army, Air Force, and Defense Petroleum Supply Center to produce Agent Pink, Agent Purple, and Agent Orange. From 1966 through 1968, Diamond accepted five additional contracts from the Defense General Supply Center to produce approximately 923,000 gallons of Agent Orange. Each of Diamond's rated contracts set forth the specifications for the herbicide to be supplied, and provided that Diamond was responsible for controlling product quality and for offering only material that conformed to contractual requirements. The United States held no financial ownership interest in the land, buildings, tools, machinery or other equipment used by Diamond during the period of time in which Diamond produced herbicides for the United States.

In Diamond's rated contracts, the United States specified the manner in which the product was to be identified and shipped, and specified what information was or was not to be placed on the Agent Orange drums. Each of Diamond's contracts was assigned a priority rating by the United States. Diamond's rated contracts provided that full responsibility for fulfillment of the contract would remain with the contractor. The contracts between Diamond and the United States did not specify any particular production process to be used in manufacturing herbicides pursuant to the contracts. The United States did not take physical possession of the herbicides it purchased from Diamond until the herbicides were delivered to the United States as specified in the contracts.

United States personnel did not hire, fire, discipline or manage any Diamond personnel working in the herbicide production process at the Newark Plant. Pursuant to the contracts, quality control inspections were conducted at the Newark Plant by United States personnel. The Quality Assurance Representative who checked shipments at the Newark Plant for conformance with labeling, packing and content specifications did not control or participate in Diamond's waste disposal activities. Other than the Walsh–

Healey Act[3] regulations incorporated into the contracts between Diamond and the United States, the contracts did not specifically contain provisions regarding the disposal of wastes.

Diamond personnel, who directed the manner of disposal of wastes at the Newark Plant, did not consult United States personnel regarding such waste disposal. The United States took no part in designing, performing or supervising activities relating to the handling, treatment or disposal of wastes during the time Diamond owned and operated the Newark Plant. Diamond disposed of wastes generated from the production of 2,4,5–T for herbicides sold to the United States and for herbicides sold to commercial customers in the same manner.

In September 1966, the Department of Defense ("DOD") requested the Business and Defense Services Administration ("BDSA") to expedite the delivery of Agent Orange. In February 1967, the Department of Commerce ("DOC") issued Diamond a priority rating to obtain the material and equipment needed for an expansion of the Newark Plant undertaken in 1967. The United States did not originate any engineering or design plans for any production machinery used in the manufacturing of herbicides at the Newark Plant. Diamond and the previous owner of the Newark Plant performed all construction and installation of machinery at the Newark Plant to produce 2,4–D and 2,4,5–T during the period Diamond and the previous owner owned the Newark Plant.

Hooker Chemical Corporation ("Hooker") was the manufacturer of the critical raw material TCB for Diamond and some other Agent Orange producers. Diamond had an existing commercial relationship with Hooker for the purchase of TCB for commercial production of herbicides prior to Diamond's contracts with the United States. Diamond did not actually purchase directly from the United States any raw materials for the manufacture of phenoxy herbicides pursuant to the contracts. During most of 1967 and 1968, the United States issued directives to Hooker on a monthly basis. These directives required Hooker to ship specific quantities of

TCB to Diamond and other manufacturers of Agent Orange on or by a specific date.

The DOC directed Hooker to complete a detailed monthly report of production, total shipments, shipments against rated orders, and end of month stocks of TCB and trichlorophenol. The United States did not make or physically possess the TCB or any other raw material which Diamond obtained, by the placement of rated orders, from Hooker or any other supplier. The United States did not at any time pay Hooker for the TCB Diamond received from Hooker.

In March 1967, the BDSA issued a directive to Diamond directing it to accelerate delivery of its existing orders for Agent Orange, and to provide the BDSA with a monthly report of production, total shipments, shipments against rated orders, and end of month inventory of 2,4–D and 2,4,5–T. In May 1967, the BDSA directed that if Diamond completed the Newark Plant expansion earlier than scheduled, and achieved higher rates of 2,4,5–T production than projected, "any 2,4,5–T which is produced must be formulated into [Agent Orange] and shipped to the Department of Defense ... pursuant to Section 101 of the Defense Production Act." The United States thus required all of the 2,4,5–T production of Diamond during this time. The United States cancelled its outstanding orders for Agent Orange in December 1968. Diamond terminated all production operations at the Newark Plant in July 1969.

In the spring of 1983, sampling conducted by the Environmental Protection Agency ("EPA") and the New Jersey Department of Environmental Protection revealed the presence of dioxin in the vicinity of the Newark Plant, which was designated the Diamond Alkali Superfund Site (the "Site"). The Site was placed on the National Priorities List in September 1984. Pursuant to administrative consent orders in March and December 1984, Diamond Shamrock commenced Site Evaluations and cleaned up certain off-site properties. These Site Evaluations constituted a Remedial Investigation to determine the nature and extent of contamination at the Site. Diamond Shamrock also conducted a Feasibility Study to develop and evaluate alterna-

---

3. The Walsh–Healey Public Contracts Act, 41 U.S.C. § 35 *et seq.* Under the Walsh–Healey Act,

Diamond was required to meet certain health and safety standards.

404

tives for the remediation of the Site. As part of the sale of its chemical division to Occidental, Diamond Shamrock (now Maxus) agreed to indemnify Occidental for the environmental response costs incurred at the Site.

In September 1987 the Regional Administrator of EPA Region II issued a Record of Decision, which discussed various alternatives for the cleanup of the Site and selected the remedial action to be implemented. In November 1990 the U.S. District Court in New Jersey entered a consent decree among the United States, the State of New Jersey, Occidental, and a Maxus subsidiary which requires the companies, and ultimately Maxus pursuant to its contractual indemnification obligation, to finance and implement the remedial action for the Site and to reimburse the state and federal governments for response costs incurred at the Site.

Maxus filed this CERCLA action in August 1992, seeking recovery of response costs and contribution for the approximately $31.5 million Maxus had already expended in response costs at the Site and nearby off-site properties, and for its future response costs. The parties have filed cross-motions for summary judgment and agree that there are no issues of material fact with respect to the question of the United States' liability under CERCLA.

## SUMMARY JUDGMENT

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment or partial judgment as a matter of law. Fed.R.Civ.P. 56(c); *Slaughter v. Southern Talc Co.*, 949 F.2d 167, 170 (5th Cir. 1991). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law will identify which facts are material. *Id.* at 248, 106 S.Ct. at 2510. The nonmovant is not required to respond to the motion until the movant properly supports his motion with competent evidence. *Russ v. International Paper Co.*, 943 F.2d 589, 591 (5th Cir.1991), *cert. denied,* 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992). However, once the movant has carried his burden of proof, the nonmovant may not sit idly by and

wait for trial. *Page v. DeLaune,* 837 F.2d 233, 239 (5th Cir.1988).

When a movant carries his initial burden, the burden then shifts to the nonmovant to show that the entry of summary judgment is inappropriate. *Duckett v. City of Cedar Park,* 950 F.2d 272, 276 (5th Cir.1992). Although the nonmovant may satisfy this burden by tendering depositions, affidavits, and other competent evidence, "[m]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment." *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). In short, "the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Merely colorable evidence or evidence not significantly probative, however, will not defeat a properly supported summary judgment. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. The existence of a mere scintilla of evidence will not suffice. *Id.* at 252, 106 S.Ct. at 2512. When the nonmoving party fails to make the requisite showing and the moving party has met its summary judgment burden, the movant is entitled to summary judgment. Fed.R.Civ.P. 56(c); *Campbell v. Sonat Offshore Drilling,* 979 F.2d 1115, 1119 (5th Cir.1992).

## DISCUSSION

The issue before the Court is whether the United States is a party that "arranged for disposal or treatment of hazardous substances" at the Site or was an "operator" of the Site so that the United States is liable to Maxus under 42 U.S.C. § 9607(a)(4)(B) for response costs Maxus has incurred and will incur at the Site, and liable to Maxus under 42 U.S.C. § 9613(f)(1) for contribution of its equitable share for the response costs Maxus has incurred and will incur at the Site.

According to the Complaint, much of the dioxin at the Newark Plant Site resulted from emanations that occurred during Diamond's mandated manufacture of the phenoxy herbicides for the United States from

1961 to 1968. Maxus alleges that the United States, through its priority rating system, controlled all access to TCB, which is the crucial starting ingredient for the 2,4,5–T production process. The United States mandated that Hooker Chemical supply TCB only to companies producing Agent Orange, so that Diamond was permitted access to TCB supplies only because Diamond was using the TCB exclusively for the production of Agent Orange. Through its control over access to TCB, the United States determined the operating level of Diamond's Newark Plant and of every other manufacturer of 2,4,5–T products. The priority rated contracts with the United States and the BDSA directive forcibly diverted Diamond's Newark Plant from the production of commercial 2,4–D and 2,4,5–T formulations for its commercial customers. The United States acted to increase Diamond's Agent Orange production capacity by actively interceding on Diamond's behalf to assist in obtaining equipment needed for the Newark Plant's expansion.

Maxus further alleges that the United States effectively commandeered the Newark Plant for use in the national defense effort, controlled and effectively owned or possessed the starting ingredient, the work in process, and the finished Agent Orange product while it was at Diamond's Newark Plant, and had the authority to control the hazardous materials used and generated during the production process. The United States mandated that the Newark Plant produce 2,4,5–T exclusively for use in the production of Agent Orange, prohibited the sale of 2,4,5–T to private customers, closely monitored production activity, required Diamond to account for production and inventory levels, sent representatives of the United States to the Newark Plant on a regular basis, controlled access to the crucial starting ingredient TCB for use in making Agent Orange, and ordered Diamond to accelerate deliveries of Agent Orange.

Maxus asserts that the United States knew that production spills, leaks, and other releases to the environment were inherent in the Agent Orange production process, and that as a result hazardous substances, including dioxin, would be released at the Site. According to Maxus, the United States is liable for response costs at the Site as an "arranger for disposal" and/or an "operator" of the Newark Plant within the meaning of CERCLA § 107. In addition, Maxus contends that the United States is liable to Maxus for contribution of its equitable share of the response costs incurred and to be incurred by Maxus at the Site, pursuant to CERCLA § 113.

The United States counters that it cannot be held liable under CERCLA § 107 either as an operator of Diamond's Newark facility or as an arranger for the disposal of hazardous substances generated by Diamond at the Newark Plant. Maxus cannot make the necessary showing that the United States participated in the management or daily operations of the facility so that the United States is not liable as an operator. In addition, Maxus cannot make the necessary showing that the United States supplied the raw materials used to make the herbicides and that it owned or possessed the raw materials, or that the United States dictated the manner in which wastes were to be disposed or in some way controlled the disposal of those wastes, so that the United States is not liable as an "arranger for disposal of hazardous waste." Finally, the United States asserts that it has not waived sovereign immunity under CERCLA to permit the imposition of liability under either the Defense Production Act or the Walsh–Healey Act.

*CERCLA Liability*

CERCLA's purpose is to facilitate the prompt clean-up of hazardous waste sites. *Matter of Bell Petroleum Services, Inc.,* 3 F.3d 889, 894 (5th Cir.1993). To establish a prima facie case of liability in a CERCLA cost recovery action, a plaintiff must prove: 1) that the site in question is a "facility" as defined in § 9601(9); 2) that the defendant is a responsible person under § 9607(a); 3) that a release or a threatened release of a hazardous substance has occurred; and 4) that the release or threatened release has caused the plaintiff to incur response costs. *Amoco Oil Co. v. Borden, Inc.,* 889 F.2d 664, 668 (5th Cir.1989). The United States does not dispute that the Newark Plant is a "facility" from which releases of hazardous substances occurred during the time herbicides were

produced, and that Maxus has incurred response costs. Maxus must therefore show that the United States is a "responsible party" under CERCLA.

To be liable as a responsible party under CERCLA, the United States must fall into one of the categories set forth in 42 U.S.C. § 9607(a):

(1) the [present] owner and operator of a ... facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ..., and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs....

*Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 760 (5th Cir.1994). Maxus contends that the United States is liable as an "arranger for disposal" of hazardous wastes at the Newark Plant, and liable as an "operator" of the Newark Plant.

*"Arranger" Liability*

■ Maxus relies on *United States v. Aceto Agricultural Chemical Corp.*, 872 F.2d 1373 (8th Cir.1989),[4] asserting that the United States is an "arranger for disposal" of hazardous substances under CERCLA because it: 1) supplied TCB, the crucial raw material; 2) controlled and "possessed" Diamond's work in process and final product; and 3) knew that the generation of hazardous wastes was inherent in the Agent Orange production process. The term "arrange for" is not defined in the statute, but "disposal" is.

Under 42 U.S.C. § 6903(3) (incorporated into CERCLA by § 9601(29)), "disposal" is the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water...."

In *Aceto*, the Eighth Circuit affirmed the district court's judgment denying the defendants' 12(b)(6) motion. The EPA and the State of Iowa sought to recover response costs incurred in the cleanup of a pesticide formulation facility operated by the Aidex Corporation. Eight pesticide manufacturers had contracted with Aidex to formulate their technical grade pesticides into commercial grade pesticides.

The complaint alleged that although Aidex performed the actual mixing or formulation process, the defendants owned the technical grade pesticide, the work in process, and the resulting commercial grade pesticide while the pesticide was in Aidex's possession. The court held that allegations that the chemical manufacturer defendants contracted with Aidex to formulate their hazardous substances into commercial pesticides, that inherent in the formulation process was the generation and disposal of wastes containing defendants' hazardous substances, and that the defendants retained ownership of their hazardous substances throughout the formulation process were sufficient to establish—for purposes of defeating a motion to dismiss—that the defendants "arranged for" disposal of hazardous substances under CERCLA. *Aceto* at 1384.

Maxus's reliance on *Aceto* is misplaced, however, as Maxus cannot show that the United States fulfills the requirements for arranger liability described in that case. The relationship between Diamond and the United States was that of buyer-seller, not manufacturer-formulator as in *Aceto*. The United States never owned the raw materials from which Diamond manufactured the Agent Orange. The critical ingredient, TCB, was supplied by Hooker. The United States merely facilitated Diamond's acquisition of

---

**4.** Maxus does not argue the alternate basis for arranger liability discussed in *United States v. Northeastern Pharmaceutical & Chemical Co.*, 810 F.2d 726, 743 (8th Cir.1986) (*NEPACCO*), imposing CERCLA liability when a personal has actual control of the disposal of hazardous substances or authority over the disposal of hazardous substances.

the TCB from Hooker. As the United States never owned the raw materials manufactured into Agent Orange, it could not have retained ownership of hazardous substances throughout the manufacturing process—another necessary element in the *Aceto* test for arranger liability.

The Court finds persuasive the reasoning of the Eighth Circuit in its recent decision *United States v. Vertac Chemical Corp.*, 46 F.3d 803 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995). In *Vertac,* a case with virtually identical facts as the present case, the successor to another manufacturer of Agent Orange sought to impose CERCLA liability upon the United States as an arranger for disposal and as operator of its facility. The Eighth Circuit determined that the United States "may not be found to have owned or possessed hazardous substances under § 9607(a)(3) merely because it had statutory or regulatory authority to control activities which involved the production, treatment or disposal of hazardous substances." *Vertac* at 810. The court noted that the United States did not immediately supervise or have direct responsibility for the transportation or disposal of any hazardous substances generated at the facility. *Id.*

The Eighth Circuit also rejected chemical manufacturer Hercules, Inc.'s argument that arranger liability existed under *Aceto,* holding that the United States simply facilitated Hercules' acquisition of TCB. The United States did not supply the raw materials to Hercules and did not own or possess the raw materials or the work in process. *Id.* at 811. This Court agrees with the Eighth Circuit that under such circumstances, the United States cannot be held liable as an "arranger

for disposal" of hazardous wastes under CERCLA.[5] As another district court has recently observed, "[n]o court has imposed arranger liability on a party who never owned or possessed, and never had any authority to control or duty to dispose of, the hazardous materials at issue." *United States v. Iron Mountain Mines, Inc.,* 881 F.Supp. 1432, 1451 (E.D.Cal.1995). The Court finds no basis upon which to impose CERCLA liability on the United States as an arranger for disposal at the Newark Plant.

*"Operator" Liability*

Maxus also contends that the United States is liable as an "operator" of the Newark Plant because it had authority to control the activity producing the contamination. Glossing over the fact that Diamond actively sought the government contracts for Agent Orange,[6] Maxus claims that the United States "effectively commandeered the Newark Plant, dictating the product to be made at the Plant, how much of that product was to be made, and to whom that product was to be sold."[7]

■ Courts have imposed operator liability under two alternative bases. Under the "actual control" test articulated in *FMC Corp. v. United States Dept. of Commerce,* 29 F.3d 833, 843 (3d Cir.1994), operator liability may result from actual or substantial control over a facility with active involvement in its activities. Under the "authority to control" test articulated in *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.), *cert. denied sub nom. Mumaw v. Nurad, Inc.,* —— U.S. ——, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), operator liability may

5. Although Maxus attempts to distinguish its case from *Vertac* by pointing out that the contamination at the Newark Plant resulted from "routine" leaks and spills and not the burial of drums of hazardous waste as Hercules had done, the Court finds this distinction immaterial. After a lengthy trial, a New Jersey appellate court discussed the extent of the contamination at the Newark Plant: "Both the air and the ground, inside and outside of the [Newark] plant, were regularly subjected to dioxin emissions through venting, and contamination from spills, leaks and 'sloppy practices' in and around the plant." *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Sur. Co.,* 258 N.J.Super. 167, 609 A.2d 440,

463 (App.Div.1992), *cert. denied,* 134 N.J. 481, 634 A.2d 528 (1993).

6. When the United States considered constructing its own plant for the manufacture of Agent Orange, Diamond and other phenoxy herbicide producers hired a lobbyist to dissuade it from doing so, asking it instead to "rely upon the industry to meet existing and future requirements" of Agent Orange. Letter from John D. Conner to Thomas D. Morris, Assistant Secretary of Defense 9 (Oct. 29, 1968).

7. Plaintiff's Brief in Support of Motion for Summary Judgment at 34.

result from the authority to control the operations of a facility or decisions involving the disposal of hazardous wastes.

In *Vertac*, the Eighth Circuit applied the "actual control" test from *FMC* and determined that the United States could not be held liable as an operator under CERCLA because it did not exercise actual or substantial control over the operations at the chemical manufacturer's facility. *Vertac* at 808. The Court draws the same conclusion in this case under the "actual control" test. Maxus has stipulated that the United States did not specify any particular production process to be used in manufacturing herbicides pursuant to the contracts. United States personnel did not hire, fire, discipline or manage any Diamond personnel working in the herbicide production process at the Newark Plant, and did not control or participate in Diamond's waste disposal activities. Diamond personnel, who directed the manner of disposal of wastes at the Newark Plant, did not consult United States personnel regarding such waste disposal. The Court concludes that the United States never exerted actual or substantial control over operations at the Newark Plant while Diamond was producing Agent Orange, so that no operator liability exists for the United States under the "actual control" test.

Maxus argues that the Court should instead apply the "authority to control" test applied in *Nurad*. Under the facts of this case, however, Maxus cannot establish that the United States had the "authority to control the operations or decisions involving the disposal of hazardous substances" at the Newark Plant. *Nurad* at 842. The *Nurad* court only held liable the owner of the property during the time of the hazardous waste disposal. That case did not address the question of whether a *purchaser* of products from the textile finishing plant could be held liable as an operator of the facility. Maxus's claim that "the United States effectively seized the Newark Plant to obtain use of the Plant's output"[8] sounds compelling, but is not supported by the summary judgment evidence. Diamond actively sought the government contracts, and when the Newark Plant was unable to produce all of the desired Agent Orange, the United States simply exercised its wartime powers to assist Diamond in obtaining the necessary raw materials and equipment needed for the plant's expansion.

Maxus also asserts that the Walsh–Healey Act and the Defense Production Act[9] provide the necessary level of control by the United States over the Newark Plant for the imposition of CERCLA liability. The identical argument was rejected in *Vertac*, and this Court rejects the argument as well. Diamond chose to bid for the Agent Orange government contracts, and to the extent Diamond had to change its operations to produce Agent Orange as opposed to other herbicides, those changes resulted from its own decision to seek the government's wartime business. The relationship between the United States and Diamond under the DPA is one of buyer and seller, except that the buyer has the power to require the seller to perform the contract and give it priority over other contracts. *Vertac* at 809–811. Maxus has submitted no evidence suggesting that Diamond refused to bid on any of the government contract bid solicitations or rejected any of the contracts it was awarded. To the contrary, Diamond joined forces with its fellow herbicide manufacturers in lobbying the United States to decide against producing Agent Orange in its own phenoxy herbicide facility, so that the United States would continue to rely on the manufacturers for this product. The Court finds no basis upon which to impose CERCLA liability on the United States as an operator of the Newark Plant.

## CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.

SO ORDERED.

---

8. Id. at 38.

9. 50 U.S.C. App. § 2061 *et seq.* ("DPA").