UNITED STATES of America, Plaintiff,

v.

IRON MOUNTAIN MINES, INC., et al., Defendants.

STATE OF CALIFORNIA, Plaintiff,

v.

IRON MOUNTAIN MINES, INC., et al., Defendants.

And Related Cross-, Counter-, and Third–Party Claims.

No. CIV–S–91–768 DFL JFM.

United States District Court, E.D. California.

Oct. 28, 1997.

---

Paul B. Galvani, Ropes and Gray, Boston, MA, for Rhone–Poulenc Inc., cross–claimant.

Thomas H. Hannigan, Jr., Ropes and Gray, Boston, MA, for Rhone–Poulnec Basic Chemicals Co., cross–claimant.

Michael Brian Hingerty, Thomas Bloomfield, U.S. Environmental Protection Agency, David B. Glazer, U.S. Dept. of Justice, Envi-

ronmental Enforcement Section, San Francisco, CA, Yoshinori H.T. Himel, U.S. Atty., Sacramento, CA, Martin F. McDermott, Mark A. Rigan, David L. Weigert, U.S. Dept. of Justice, Environmental & Natural Resources Division, Washington, DC, for U.S., Plaintiff.

Thomas G. Redmon, Wilke Fleury Hoffelt Gould and Birney, Sacramento, CA, for Rhône–Poulenc Basic Chemicals Co, defendant.

Margarita Padilla, California State Atty. General, Oakland, CA, for State of California, plaintiff.

Sara J. Russell, Atty. General's Office of the State of California, Oakland, CA, for State of California, plaintiff.

## MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

This is a cost recovery action brought by the United States and the State of California under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., to recover response costs for cleanup measures taken at the Iron Mountain Mine site, a series of now inactive mines on Iron Mountain located approximately nine miles northwest of Redding, California. Acid mine drainage from the old mine workings flows into the Sacramento river above the Keswick Dam.[1]

In these cross motions for summary judgment, the court revisits defendant Rhône–Poulenc's counterclaim against the United States in which Rhône–Poulenc claims that the United States should be liable for a portion of the response costs because much of the mining occurred during and just after World War II at the instance of the government. *See United States v. Iron Mountain Mines,* 881 F.Supp. 1432 (E.D.Cal.1995); *U.S. v. Iron Mountain Mines, Inc.,* 881

F.Supp. 1432 (E.D.Cal.1995). Rhône–Poulenc argues that during this time period the federal government exercised sufficient control over Iron Mountain Mine to incur liability as an "operator" of the Mine. *See* 42 U.S.C. §§ 9601(20)(A) & 9607(a)(2).[2] In particular, Rhône–Poulenc alleges that the federal government paid its predecessor, Mountain Copper Company, Ltd., a bounty to mine for copper and zinc by setting premium prices for these metals, provided labor, supervised wages, upgraded the road to the mine using mining waste, assured rail service, and dictated who could purchase the output of the mine.

For the reasons stated below, the court finds that Rhône–Poulenc fails to show that the United States had sufficient control over the Mine to subject it to liability as an operator under CERCLA.

### I.

In 1894 a group of British investors purchased the Iron Mountain Mine site. Two years later they formed Mountain Copper Company, Ltd. to mine the site. Rhône–Poulenc is the corporate successor to Mountain Copper. From 1896 until the outbreak of World War II, Mountain Copper principally engaged in three types of mining at Iron Mountain: copper mining up to 1930, followed by gold and pyrite mining from 1929 until shortly after World War II began.[3]

After the United States entered World War II, President Roosevelt created a number of federal agencies to organize domestic industry for wartime production.[4] In January 1942, the War Production Board was established to exercise general direction over the government's production and procurement efforts. Executive Order No. 9040, 7 Fed.Reg. 527 (1942); *see* Rhône–Poulenc Exh. 1 at ¶ 28 (describing the War Produc-

---

**1.** Acid main drainage is formed when exposed sulfide deposits react with rain and ground water. *See* Berry Decl. ¶ 13 ("The acid generated from oxidation of pyrite and other associated sulfides dissolves other minerals, and liberates additional chemical components including copper and zinc.").

**2.** Rhône-Poulenc also argues that the United States is liable as an "arranger" under § 9607(a)(3). *See infra* note 19.

**3.** The gold was extracted from gossan which is the substance that was mined. Pyrite is used to make sulfuric acid.

**4.** See *East Bay Municipal Utility District v. United States Dept. of Commerce,* 948 F.Supp. 78 (D.D.C.1996), for a thorough discussion of wartime regulation of the mining industry.

tion Board). The War Production Board, along with its predecessor the Office of Production Management, promptly put into place the Premium Price Plan to enhance production of war related items, including metals.[5] Rhône–Poulenc Exh. 1 at ¶ 44. One of the purposes of the Premium Price Plan was to "expand output of copper, lead and zinc"—metals deemed necessary to the war effort—by subsidizing the excavation of those metals so that it would be profitable for privately-owned mines to develop marginal veins of ore. Rhône–Poulenc Exh. 1 at ¶ 44, 20. Under the Premium Price Plan, all mines were assigned a quota reflecting their pre-war production levels of copper, lead, and zinc. The mines were then paid the subsidized premium price for all copper, lead, and zinc production over their quota. Like many other mines, Iron Mountain Mine was assigned a "zero quota" because it was not excavating those metals in 1941, with the result that the Mine received the premium price for all of its zinc and copper production.

The Quota Committee, which was composed of members of the War Production Board and the Office of Production Management, established the subsidy, or premium price, to be paid to the privately-owned mines. Rhône–Poulenc Exh. 20. The premium price the Quota Committee initially set for copper was 17 cents per pound and for zinc was 11 cents per pound. Rhône–Poulenc Exh. 23. The Quota Committee revised those prices in early 1943 to encourage additional production by privately-owned mines. Rhône–Poulenc Exh. 27. From 1943 onward, in addition to the previously authorized subsidies called the "A" quota, the Quota Committee could assign a "B" quota, providing an

additional 2¾ cents per pound, and a "C" quota, providing another 2¾ cents per pound on top of the "B" quota amount. Rhône–Poulenc Exh. 27. As to zinc mining, the supplemental "B" and "C" quotas were paid based on the size of the mine; as to copper mining, however, the decision whether to pay the supplemental quotas was made on a case-by-case basis.[6] Gordon Decl., ¶ 11. None of the quotas were for fixed production goals; "they were open-ended—in Mountain Copper's case for 'all your [copper] production over 40 tons per month.'" Id.

Under the Premium Price Plan, the mines could sell the metals at the subsidized price to the Metals Reserve Company, a corporation created by the federal government to procure metals necessary to the military effort. Alternatively, the mines could sell the metals to other private entities, such as smelters, and the Metals Reserve Company would reimburse the private buyers for the cost of the subsidy. The subsidized sale had to be approved by the federal government which used this approval power to channel the metals toward the highest priority use.[7]

Almost immediately after the Premium Price Plan was instituted, Mountain Copper wrote a letter to the Metals Reserve Company, proposing that Mountain Copper sell zinc and copper concentrates to the American Smelting and Refining Company ("American Smelting") at the premium price with the understanding that the Metals Reserve Company would reimburse American Smelting for the subsidy paid to Mountain Copper. See Rhône–Poulenc Exh. 34. Mountain Copper informed the Metals Reserve Company

---

5. The War Production Board's powers also included the ability to direct the Army or Navy to seize privately-owned production facilities. Rhône–Poulenc Exh. 1 at ¶ 31. Prior to 1943, seizure was authorized for facilities that could supply materials necessary for defense but that refused to do so altogether or at a reasonable price. After 1943, the War Production Board could authorize the seizure of facilities where production was crippled by labor stoppages. There is no evidence that there were labor problems at Iron Mountain Mine or that seizure was ever threatened. See United States Exh. 5 (Huseby Dep., Vol. III, at 194:6–28) (General Manager of Iron Mountain Mine during World War II testifying that he was not concerned about government seizure of the Mine).

6. Although issued on an individual basis, a number of supplemental quotas were issued to copper mines over the life of the Premium Price Plan. See Gordon Decl., ¶ 11 (by December 1, 1943, 127 supplemental copper quotas had been issued); see also Rhône–Poulenc Exh. 114 (17 major copper projects, including Iron Mountain Mine, were approved and brought into production by the Copper Division of War Production Board).

7. The federal government created a priority rating system to determine what was the highest priority use. See e.g. Rhône–Poulenc Exh. 248 (discussing the priority system for copper).

that it had an abandoned mill in El Dorado County that could be dismantled and then reconstructed at Iron Mountain to reduce its sulphide copper ore to zinc and copper concentrates. Rhône–Poulenc Exh. 34. After months of negotiations with the Metals Reserve Company, Mountain Copper entered into two contracts—one with American Smelting to sell its output of copper concentrates at the premium price and the other with the Metals Reserve Company to sell its output of zinc concentrates at the premium price.[8] Rhône–Poulenc Exhs. 53, 60. Upon signing the two contracts, Mountain Copper started the process of moving its abandoned mill from El Dorado County to Iron Mountain. Mountain Copper did not require any direct assistance from the federal government to reconstruct or equip the mill, but it did seek tax relief under § 142 of the Internal Revenue Code for its expenses. Rhône–Poulenc Exh. 63.

Soon thereafter, Mountain Copper began performing on the contracts by providing its output of zinc and copper concentrates to its buyers. One of the requirements of the contracts was that Mountain Copper agreed to comply with the terms of the Premium Price Plan. *See* Rhône–Poulenc Exh. 60. Under the Premium Price Plan, mines receiving subsidies were required to submit monthly operating reports to the federal government, which Mountain Copper did. *E.g.* Rhône–Poulenc Exhs. 85—88.[9]

Like most mines during World War II, Iron Mountain Mine had difficulty finding and retaining a sufficient number of qualified employees to operate the Mine. The War Manpower Commission was established in April 1942 to respond to such labor shortages in industries critical to the war effort. Rhône–Poulenc Exh. 1 at ¶ 35; *see* Exec. Order No. 9139, 7 Fed.Reg. 2919 (1942). To address the problem in the mining industry, the War Manpower Commission issued an Employment Stabilization Order, providing that a worker from a non-ferrous mine could only seek other employment after obtaining a "Certificate of Separation" from the United States Employment Service. Rhône–Poulenc Exh. 1 at ¶ 52; *see* 7 Fed.Reg. 7131 (1942). In October 1942, the War Production Board also ordered that all nonessential gold mines be closed, freeing additional miners for non-ferrous metal mining. And beginning in June 1943, the War Production Board, at the request of the War Manpower Commission and the United States Employment Service, classified mines into four categories, depending on their importance to the war effort and their relative productivity. Rhône–Poulenc Exh. 129. The purpose of this classification system was to assist in placing workers in those mines in the highest priority category, although workers were never required to seek employment at high-priority mines. Conversely, the mines were never required to hire or fire a particular worker. *See* United States Exh. 6 (Huseby Dep., Vol. III, at 157:4–19) (testifying that Iron Mountain decided whether to hire the United States Employment Service referrals). In addition to United States Employment Service placements, the Selective Service and local draft boards granted deferments from military service for workers in industries deemed to be essential, such as mining. Rhône–Poulenc Exh. 1 at ¶ 57. The Selective Service also released approximately 4,500 men from the Enlisted Reserve Corp to work in copper and zinc mines. Rhône–Poulenc Exh. 156. A significant portion of Mountain Copper's employees at Iron Mountain Mine were United States Employment Service placements or were there as a result of deferments from military service. *E.g.* Exh. 141 (deferment granted to a carpenter, who was essential to the construction and maintenance of the mill). *See* Rhône–Poulenc Exhs. 134, 135 (Mountain Copper was classified as a Class I, List A operation, the highest priority category); *but see* Rhône–Poulenc Exh. 196 (sug-

8. The zinc concentrates the Metals Reserve Company purchased were sent to the Anaconda Copper Mining Company to be processed. Ultimately, Anaconda took over the zinc concentrates contract for the Metals Reserve Company.

9. Mountain Copper also acted as a private buyer, and was reimbursed for the subsidized prices it paid by the Metal Reserves Company under the Premium Price Plan. *See* Rhône–Poulenc Exhs. 292—307. Mountain Copper purchased copper cement, a solid precipitate created from acid mine drainage, that had been created at both Iron Mountain Mine and the Dalton Mine, which was owned by the West Lode Reduction Company.

gesting that Mountain Copper was classified as Class II, List B).

Wage rates, work weeks, and other employment conditions were regulated during World War II on a nation-wide basis by the National War Labor Board.[10] Whenever an employer wanted to adjust the wage for a particular job, the employer was required to submit an "Application for Approval of a Voluntary Wage or Salary Rate Adjustment" to the National War Labor Board. *See* Rhône–Poulenc Exh. 166; *see also* Rhône–Poulenc Exhs. 184—188 (correspondence regarding a downward wage adjustment for female bucket loaders); Rhône–Poulenc Exhs. 190—192 (correspondence regarding different wages for linemen and apprentice linemen). Moreover, if an employer was not in compliance with the National War Labor Board wage rates and employment conditions, the employer could be sanctioned. *See e.g.* Rhône–Poulenc Exh. 189. These regulations affected Mountain Copper's operations at Iron Mountain Mine. Similarly, Iron Mountain Mine continued to be subject to health and safety regulations affecting the entire mining industry. During the War, the federal government was particularly vigilant to ferret out health and safety violations for fear that such violations could lead to interruptions in metal production. *See* Rhône–Poulenc Exh. 200. As a result, Iron Mountain Mine was subject to numerous inspections. *See* Rhône–Poulenc Exh. 268 (assigning Iron Mountain Mine a "F-3" rating, meaning that it was to be inspected at 15 to 24 month intervals).

Iron Mountain Mine also benefited from a number of other federal programs that were instituted to assist private industry in meeting wartime demands. For example, the War Production Board allocated scarce but necessary equipment and supplies to mining companies. Iron Mountain Mine, like other mines, obtained some supplies through the War Production Board. *See* Rhône–Poulenc Exhs. 39–43 (correspondence between Mountain Copper and the War Production Board regarding watches and paper bags). More significantly, under the Federal Highway Act and the Defense Highway Act of 1941, the Public Roads Administration provided federal funds to surface the 14.4 mile, dirt and gravel road that ran from Iron Mountain Mine to Highway 20. A portion of the road was on Iron Mountain Mine property although the majority was not. Rhône–Poulenc Exh. 218. The project was supervised by employees of the Public Roads Administration, who were required to submit weekly and monthly reports outlining the progress on the road. Rhône–Poulenc Exhs. 220, 221. Shasta County and Mountain Copper provided the workers and the equipment necessary to surface the road; they were reimbursed by the Public Roads Administration. Rhône–Poulenc Exh. 218. The principal source of surfacing material was a pile of hematite mining waste that resembled natural cinders.[11] Rhône–Poulenc Exh. 204. The resurfacing project took ten months. Once the project was completed, Shasta County took over the management and upkeep of the road.[12]

The Premium Price Plan expired after one extension on June 30, 1947. Rhône–Poulenc Exh. 15. Around that time, copper and zinc concentrate production at Iron Mountain Mine ceased—both because production was no longer profitable without the subsidies and because the veins being excavated during World War II were nearly exhausted. *See* Rhône–Poulenc Exh. 110; Berry Decl.,

---

**10.** The Non–Ferrous Metals Commission was the division of the National War Labor Board that dealt with the mining industry.

**11.** Some sections of the road were also paved with river gravel.

**12.** In addition to the road, Iron Mountain Mine depended upon a portion of the Southern Pacific rail line, running between Redding and Coram. On September 2, 1938, the United States and Southern Pacific entered into a contract for the sale to the United States of the railroad between Redding and Delta, California, which included the portion between Redding and Coram. Rhône–Poulenc Exh. 227. The sale came about as a result of the plans for construction of the Shasta Dam, which would flood that portion of the railroad and necessitate its abandonment. On January 17, 1941, the Interstate Commerce Commission ("ICC") generally approved of the abandonment and sale of the Southern Pacific line. Rhône–Poulenc Exh. 230. But the ICC also noted that the United States and Southern Pacific had entered into a new contract, in which the United States granted to Southern Pacific the right to continue to operate the small portion of the line used by Mountain Copper.

Exh. 6 at 45. Iron Mountain Mine continued to benefit from post-war federal mining subsidies, however. On September 14, 1946, the federal government instituted the Exploration Premium Program to encourage the development of new sources of copper, lead, and zinc. Rhône–Poulenc Exh. 290. Hundreds of mines qualified for and received funds under this post-war program. *See* Rhône–Poulenc Exh. 305 (showing that 381 mines participated in the program). On January 21, 1947, Mountain Copper applied for premiums to fund exploratory drilling at three sites on Iron Mountain. Rhône–Poulenc Exh. 291. Mountain Copper's application was granted as to two of the sites for the period from January 1, 1947, through December 31, 1947. Rhône–Poulenc Exh. 300. To participate in the program, Mountain Copper was required to use the federal funds to drill only in the areas and in the manner described in its application and to file detailed monthly reports to demonstrate that it was in compliance with the restrictions. Rhône–Poulenc Exh. 301. However, Mountain Copper remained free to explore other sites using its own funds. United States Exh. 10 (Huseby Dep., Vol. III at 217:7—25).

Throughout this period during and immediately after World War II, the federal government generally knew how Mountain Copper was operating Iron Mountain Mine. It had inspected Iron Mountain Mine's operations on numerous occasions. *E.g.* Rhône–Poulenc Exh. 200. The federal government also knew that the mining was generating waste products such as tailings and acid mine drainage. Indeed, in 1941 the United States Bureau of Mines prepared a feasibility study as to the costs of precipitating the copper present in the acid mine drainage created at Iron Mountain Mine. Rhône–Poulenc Exh. 117; *see also* Rhône–Poulenc Exhs. 9, 118, 119, 121 (discussions between Mountain Copper and the federal government regarding whether the tailings at Iron Mountain Mine could be marketed for their pyrite content).

Based upon the government activity at Iron Mountain Mine during and just after the War, Rhône–Poulenc argues that the United States should share in the cost of remediating the acid mine drainage created as a result of the mining during this period. To press its point, Rhône–Poulenc further contends that the majority of the response costs incurred by EPA to date are in response to acid mine drainage generated by World War II mining activity as opposed to other mining undertaken by Mountain Copper over its considerable history.

## II.

CERCLA creates a right of recovery against any "person" responsible for the costs incurred in responding to a "release" or "threatened release" of a hazardous substance at a "facility." 42 U.S.C. § 9607(a). Liability for response costs is placed upon owners, operators, arrangers, and transporters. The United States can be held liable as a person if its activities as an owner, operator, arranger, or transporter caused response costs. *See* 42 U.S.C. §§ 9607(a)(liability) & 9601(21) ("person" includes the United States Government).

If there is more than one responsible person, the court can "allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). In this motion, Rhône–Poulenc argues that for the period during and immediately after World War II, the federal government was a responsible person as an "operator" of Iron Mountain Mine under § 9607(a)(2). Unfortunately, the term "operator" is not well defined in CERCLA; the statute defines "operator" as "any person ... operating" a facility. 42 U.S.C. § 9601(20)(A). Because the statutory definition is unhelpful, the meaning of the term has been developed case by case.

■ Courts impose operator liability if the person "play[ed] an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management," *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin California Living Trust,* 32 F.3d 1364, 1367 (9th Cir.1994) (citations omitted), or if the person "had authority to control the cause of the contamination at the time the hazardous substances were released into the environment," *Kaiser Aluminum v. Catellus Development Corp.,* 976 F.2d 1338, 1341 (9th Cir.1992) (citing *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 842 (4th Cir.1992)). *Accord U.S. v. Vertac Chemical Corp.,* 46 F.3d 803, 808 (8th Cir.

1995); *FMC Corp. v. United States Dept. of Commerce,* 29 F.3d 833, 843 (3rd Cir.1994); *East Bay Municipal Utility District v. United States Dept. of Commerce,* 948 F.Supp. 78, 89 (D.D.C.1996); *State of Washington v. United States,* 930 F.Supp. 474, 483 (W.D.Wash.1996); *Maxus Energy Corp. v. United States,* 898 F.Supp. 399, 407 (N.D.Tex.1995), *aff'd* 95 F.3d 1148 (5th Cir. 1996); *United States v. Iron Mountain Mines,* 881 F.Supp. 1432, 1449 (E.D.Cal. 1995).[13]

█ The court concludes that despite extensive archival research and discovery, Rhône–Poulenc has failed to show that the United States exercised the requisite degree of authority or control over the Mine to subject it to liability as an operator.[14]

Rhône-Poulenc argues that the facts here are comparable to those in *FMC Corp. v. United States Dept. of Commerce,* 29 F.3d 833, the only case in which operator liability has been imposed on the government because of its World War II involvement in the operation of a private company. In *FMC,* the Third Circuit found the government liable based on the following factors:

The government determined what product the facility would manufacture, controlled the supply and price of the facility's raw materials, in part by building or causing plants to be built near the facility for their production, supplied equipment for use in the manufacturing process, acted to ensure that the facility retained an adequate labor force, participated in the management and supervision of the labor force, had the

authority to remove workers who were incompetent or guilty of misconduct, controlled the price of the facility's product, and controlled who could purchase the product.

29 F.3d at 843. Rhône–Poulenc argues that the United States exercised like authority over Mountain Copper. In summary, Rhône–Poulenc argues: (1) through the Premium Price Plan the government determined what would be mined, and in what quantities, at what price the output of the Mine could be sold for and to whom; (2) through its control of the labor force, the United States supplied labor, determined wage rates, set minimum hours, and established job classifications; (3) through the tax system and by arranging for advance payments of premiums, the United States helped to finance the mining at Iron Mountain; (4) by building the road to the Mine and by permitting Southern Pacific to continue to serve the Mine by rail, the government directly facilitated the mining operation; (5) by carrying on an extensive correspondence with Mountain Copper managers, requiring monthly reports about the Mine's output, visiting and inspecting the Mine, the government closely monitored the activity at the Mine; and (6) by studying the feasibility of removing hazardous substances from the mine drainage, by arranging for customers to purchase tailings piles at the Mine, and by using a waste pile to build the access road, the government took charge of the pollution at the site. Rhône–Poulenc Opp'n & Reply at 5–7.

However, even if the government assisted, facilitated, and provided incentives in just the

---

13. The cases sometimes speak in terms of an "actual control" test and an "authority to control" test.

14. In two prior opinions, the court has addressed the United States' potential World War II operator liability in the context of motions to dismiss. In *United States v. Iron Mountain Mines,* 881 F.Supp. 1432 (E.D.Cal.1995), the court granted the United States' motion to dismiss Rhône–Poulenc's World War II counterclaim, finding that:

Although the United States certainly played the role of a very interested consumer during the War, RP's counterclaim is bereft of any allegations that the United States was involved in the "hands-on, day-to-day" management of the mine, *Long Beach Unified Sch. Dist.,* 32 F.3d at 1367, or that the United States controlled the cause of contamination, the mining equipment,

or made any decisions regarding disposal of the mining waste. *Kaiser,* 976 F.2d at 1341. Nor are there any allegations that the United States supplied the mine with mining equipment or any other materials. Purchasing a product and encouraging its production are not the same as controlling the cause of the contamination or managing the mine.

*Id.* at 1450. The allegations in the counterclaim were virtually the same as the allegations of government control advanced in this motion.

After the counterclaim was dismissed, Rhône–Poulenc moved to amend to allege that the United States exercised control over mining waste as demonstrated by its construction of the road with such waste. Based on this new allegation, the court permitted the amended counterclaim to go forward. *Iron Mountain Mines,* CIV–S–91–1167 at 3–4.

way that Rhône–Poulenc claims, the government still would not be an operator under CERCLA. While it may have monitored activity at the Mine, the United States did not participate in "day-to day" management nor did it have the right to do so. Despite its creation of various incentives and programs to assist mining companies, the government did not compel Mountain Copper to do any mining at Iron Mountain; it did not require Mountain Copper to extract a certain amount of any substance from Iron Mountain; and it did not issue commands to Mountain Copper as to how, where or when to mine. Furthermore, although aware—as was Mountain Copper—that acid mine drainage was a foreseeable result of the mining, the government did not assume responsibility for the drainage or relieve Mountain Copper from the responsibility. In short, in terms of basic operational decisions such as whether to mine at all, how much to produce, where on the mountain to mine, and whether to ameliorate the creation of acid mine drainage, Mountain Copper remained firmly in charge and never shared control with the United States.

The degree of government control over Mountain Copper is distinguishable from that exercised by the government over American Viscose, the company at issue in *FMC*. According to the Third Circuit, the most important factors are "what product the facility would produce, the level of production, the price of the product, and to whom the product would be sold." *FMC*, 29 F.3d at 843. In *FMC*, the War Production Board determined that high tenacity rayon was a critical product for fighting World War II and ordered American Viscose to convert one of its facilities from producing regular textile ray-

on to only producing high tenacity rayon to be sold exclusively to the government. *Id.* at 836. By contrast, in this case the federal government did not order Mountain Copper to produce copper and zinc concentrates at Iron Mountain Mine. Rather, the federal government instituted the Premium Price Plan, a financial incentive program designed to encourage private industry to meet wartime production goals for materials needed to fight the war. Mountain Copper aggressively sought out the federal government's business based on the subsidies provided under the Premium Price Plan. After months of negotiations, Mountain Copper freely entered into two output contracts and thereafter sold its zinc and copper concentrates to its buyers as provided for under those contracts, which included price, quality, and quantity terms.[15]

Thus, to the extent that Mountain Copper changed its operations to produce copper and zinc concentrates, those changes resulted from its own decision to seek the federal government's wartime business.[16] *See Vertac*, 46 F.3d at 809 (finding that the plant elected to produce Agent Orange where it freely entered into a contract with the federal government); *East Bay Municipal Utility District*, 948 F.Supp. at 89–90 (finding that the production of zinc was "the result of a consensual, contractual agreement" between the mine and Metals Reserve Company); *Maxus*, 898 F.Supp. at 407. It could have declined the business and closed the mine. That Mountain Copper was motivated to seek the government's wartime business by the subsidies created under the Premium Price Plan is irrelevant. As stated in *East Bay Municipal Utility District*, a case with facts that are nearly identical to this one,[17] by operating the Premium Price Plan:

15. In *FMC*, the government also controlled American Viscose's profits by controlling the supply and price of American Viscose's raw materials. *Id.* at 837. Here, Mountain Copper had exclusive control over its raw materials because it controlled the Iron Mountain Mine site where the metals were located.

16. Rhône–Poulenc suggests that the threat of government seizure of Iron Mountain Mine was the fist inside the velvet glove. However, Rhône–Poulenc presents no evidence that Mountain Copper was motivated by the fear that the Mine would be seized. Indeed, the only evidence on the issue indicates that Mountain Copper was

not concerned about government seizure. United States Exh. 5 (Huseby Dep., Vol. III at 194:6—28). By contrast, in *FMC* the court noted that the government had seized a high tenacity rayon plant that fell short of the government's production goals and concluded that if American Viscose had not complied "with the government's production requirements, the government would have seized the facility." *FMC*, 29 F.3d at 836.

17. In *East Bay Municipal Utility District*, a municipal utility district sought contribution from the United States for its alleged role in creating

The government engaged in classic economic regulation by providing financial incentives to private industry to meet wartime production goals. Had the incentives failed, the government could simply have purchased or leased its own ... mine. It would then have been an operator. However, simply because the government was able to achieve its goals indirectly by using economic incentives does not, under CERCLA, make it directly liable.

948 F.Supp. at 91. Moreover, it would not be accurate to equate the government's insistence on defined production goals and specifications in *FMC* with the price incentives provided to Mountain Copper. These incentives were not for fixed production goals, and Mountain Copper was not compelled to take advantage of the premiums.

■ A similar analysis applies to Rhône–Poulenc's contentions concerning government control in the immediate post-World War II period. The only evidence Rhône–Poulenc cites in support of its contention that the United States exercised control over operations at Iron Mountain Mine during this time is Mountain Copper's participation in the Exploration Premium Program—a financial incentive program to encourage private industry to develop new sources for copper, lead, and zinc. Mountain Copper, like hundreds of other mines, voluntarily applied for and received funds for its proposed exploratory drilling. If Mountain Copper did not want to perform the drilling at all or if it did not want to drill in areas and in the manner prescribed by the United States, Mountain Copper only had to refrain from accepting funding. As with the Premium Price Plan, to the extent that Mountain Copper changed its operations to mine in a particular place or way, those changes resulted from its own decision to seek federal government funding, not from any governmental directive. *See Vertac*, 46 F.3d at 809; *East Bay Municipal Utility District*, 948 F.Supp. at 89–90; *Maxus*, 898 F.Supp. at 407.

The federal government also had more control over American Viscose's workforce in *FMC* than it had over Mountain Copper's workforce at Iron Mountain Mine. In *FMC* the federal government participated directly in the management and supervision of American Viscose's employees. *FMC*, 29 F.3d at 837. The War Production Board appointed a full-time representative for the American Viscose facility to address manpower, housing, community services, and other related problems. *Id.* The government representative could remove workers for incompetence or misconduct. No such government representative was present at Iron Mountain Mine. *See East Bay Municipal Utility District*, 948 F.Supp. at 90 (suggesting that the direct hiring, firing, or disciplining of the mine's workforce is required). The only authority the federal government had over Mountain Copper's workforce at Iron Mountain Mine was derived from its general regulation of the economy, the labor force, and the mining industry during World War II. Iron Mountain Mine, like all other mines, was subject to economic regulation, including fixed wages and hours. The Mine was required to comply with health and safety regulations, and no miner could work for Mountain Copper who did not have a certificate of separation from the United States Employment Service. Further, the government assisted Mountain Copper in finding trained employees. But these measures taken as a whole are not tantamount to government control of the workforce. The government did not hire, fire, or discipline workers or insist that Mountain Copper do so.

In *FMC* the court found that the government had provided supporting facilities and large amounts of government-owned equipment to American Viscose. *FMC.* 29 F.3d at 837. Not only did the United States collect rent for the equipment, but it also retained substantial control over American Viscose's use of that equipment. *Id.* Because of its provision of equipment, the United States could promulgate rules governing all operations at the work site. *Id.* In addition, the

the acid mine drainage that contaminated Penn Mine and the area surrounding the Mine. The district argued that the United States should be liable as an operator of Penn Mine for the period during and immediately after World War II as a result of the subsidies Penn Mine received under

the Premium Price Plan and the federal government's regulation of Penn Mine. *See* 42 U.S.C. § 9607(a)(2). The district court found that this level of government involvement was not such as to make the government an operator under CERCLA.

United States built and retained ownership of a sulfuric acid plant adjacent to the American Viscose plant to ensure that American Viscose had an adequate supply of the raw materials it needed. *Id.* Through the facilities and equipment, the federal government was a partner in the manufacturing process.

By contrast, the government's supporting activities at Iron Mountain Mine were of much lesser importance. Mountain Copper asked for a tax write-off, and the government granted it. Mountain Copper asked for small items such as watches, and the government gave some. The Public Roads Administration provided federal funds to surface the access road to Iron Mountain Mine, and two Public Roads Administration employees supervised the roadwork for ten months. Shasta County took over the road once the surfacing was completed ten months later. This level and degree of government assistance does not compare to the extensive commitment of resources and equipment that the federal government made in *FMC*.[18]

■ Finally, in *FMC* the court found that the government had directly contributed to the production of waste by American Viscose. The government had provided the equipment that generated waste and had set production levels that had overtaxed the machinery leading to the generation of increased waste. *Id.* at 838. The United States had no such control over waste at Iron Mountain Mine. In particular, neither during or immediately after the War did the United States control or influence the waste disposal methods used at Iron Mountain Mine. *See Kaiser Aluminum,* 976 F.2d at 1341–42 ("'operator' liability under § 9607(a)(2) only attaches if the defendant had authority to control the cause of the contamination at the time the hazardous substances were released into the environ-

ment"). Certainly, the government was aware that mining at Iron Mountain would produce acid mine drainage. *See* Rhône–Poulenc Exh. 117; *see also* Rhône–Poulenc Exhs. 9, 118, 119, 121 (discussions between Mountain Copper and the federal government regarding whether the tailings could be marketed for their pyrite content). However, knowledge alone does not amount to control.[19] Similarly, the government did not exert control over waste simply because the Metal Reserves Company reimbursed Mountain Copper for the subsidized price Mountain Copper paid for copper cement. *See* Rhône–Poulenc Exhs. 292–307; *compare East Bay Municipal Utility District,* 948 F.Supp. at 92–93 (discussing *Bunker Hill* in which a parent company controlled the subsidiary's Board of Directors and only allocated $ 500 to be spent on pollution abatement).

■ The only instance in which the federal government arguably controlled waste disposal at Iron Mountain Mine was when the Public Roads Administration supervised the access road surfacing project. The principal source of surfacing material was a pile of hematite mining waste, accumulated by Mountain Copper over a long period, that may have contained metals. The waste pile was offered by Mountain Copper to the government at no charge. If it develops that the road is a source of release of hazardous waste, the government may be liable as an arranger as to the road. But the isolated instance of government involvement with an accumulated quantity of mining rubble is not sufficient to deem the government an operator of the Iron Mountain Mine.

Overall, Rhône–Poulenc has failed to show that the federal government played an active role in running Iron Mountain Mine, such that the government became an operator.[20]

---

**18.** The United States also renegotiated its contract with Southern Pacific so that Southern Pacific could continue to operate the portion of the railroad between Redding and Coram used by Mountain Copper to deliver the metals excavated from Iron Mountain Mine.

**19.** *See East Bay Municipal Utility District,* 948 F.Supp. at 92 (citing *Idaho v. Bunker Hill Co.,* 635 F.Supp. 665, 672 (D.Idaho 1986)) (finding that for an entity to have the "authority to control" waste disposal that entity must have not only "the capacity to make timely discovery," but also the "power to direct the activities of persons

who control the mechanisms causing the pollution" and "the capacity to prevent and abate damage").

**20.** Alternatively, Rhône–Poulenc argues that the United States is liable as an "arranger" under § 9607(a)(3). To prevail, Rhône–Poulenc must show that the federal government both owned or possessed hazardous substances and arranged for the disposal or treatment of those substances. Aside from the access road, Rhône–Poulenc's only argument in support of its position that the United States arranged for the disposal of haz-

Rhône–Poulenc has uncovered only one example of direct management—the Public Roads Administration's ten-month supervision of the surfacing of the access road. This hardly constitutes substantial participation in the management of the Iron Mountain Mine. Otherwise, Rhône–Poulenc's evidence is limited to government financing, subsidies, and regulations that were applicable to all mines producing materials necessary to the war effort. *See East Bay Municipal Utility District,* 948 F.Supp. at 91 ("Congress cannot have intended that any type of societal benefit realized by government regulation expose the government to liability."). Nor does Rhône–Poulenc show that the United States "'possessed the authority to abate the damage caused by the disposal of hazardous substances but ... declined to actually exercise that authority by undertaking efforts at a cleanup.'" *Id.* at 92 (quoting *Nurad,* 966 F.2d at 842); *accord Kaiser Aluminum,* 976 F.2d at 1342–43. Except in the limited instance of the road construction, which may or may not generate acid mine drainage, the United States did not have control or authority over the disposal of the materials that created acid mine drainage.

### III.

For the reasons stated above, the United States' motion for summary judgment is GRANTED as to Rhône–Poulenc's counterclaim that the United States is liable as an operator of Iron Mountain Mine for the period during and immediately after World War II, and Rhône–Poulenc's motion for summary judgment is DENIED.

IT IS SO ORDERED.

ardous substances at the Mine is that the United States controlled the mining. Because the court has concluded that the United States did not control Mountain Copper's mining activities, there can be no arranger liability on this theory. Rhône–Poulenc also appears to argue that if the road has generated any hazardous waste and if the government is liable for a share of response costs as to the road, then the government is also responsible for a share of all response costs anywhere at the site. This argument merits little attention. CERCLA requires that there be some nexus between the contamination and the response costs that have been incurred. *See* 42 U.S.C. § 9607(a). Rhône–Poulenc has failed to show that it has incurred any response costs as a result of the surfacing of the access road during World War II.